# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| JIMMY ADAMS, MOSES AGBOOLA, ERIC AZUBUIKE, DRUSILLA BAILEY, DELIAH BROWN, FELICIA RUCKER-CARTER, PAULINA CARY, HYGINUS CHUKWU, AVA COSEY, TERRENCE CROSBY, LINDA DENKINS, BRIGETTE DENNIS, CHARLES DRAYDEN, LORLIE ELLIS, AYOADE FARINDE, JONAH FORD, ROSALYN FRANCIS, CHERYL GOODE, BRANDY GRIFFIN, SHULETA HARRIS, AFRAH HASSAN, QUINCY HENDERSON, CLENNIS HIGH, AVIS HORDE, ERICA HUBBARD, RODNEY JACKSON, VERNITA JACKSON, CHINA JENKINS, MICHELLE JOHNSON, ANDREA JONES, SHALNADRIA JONES, STEPHANIE JONES, ELLAMEES KELLY-MOLO, ELFREDA KING, DORIS LACEY, KIMBERLY MASON, DEBRA MCGAUGHEY, LUE MIMS, KISHMA MORANICE, MARY PAGE, RUTH PARHAM, BEVERLY PERRY, FREDRICK PORTIS, REYNALDO PRADIA, ERICA RHONE, DEBRA ROBINSON, TIFFANY ROUBLEAU, MELODY DANCER SAMUELS, SAMOAN SCOTT, SHONNA STOOT, LEON THIBODEAUX, DORSETTA WILLIAMS, MARCUS WINTERS, AND LAQUINTA VARGAS<br>*Plaintiffs,*<br><br>v.<br><br><br><br><br>HOUSTON COMMUNITY COLLEGE SYSTEM<br>*DEFENDANT.* | CIVIL ACTION NO._____<br><br>**JURY DEMANDED** |

<u>**PLAINTIFFS' ORIGINAL COMPLAINT AND
REQUEST FOR JURY TRIAL**</u>

**TO THE HONORABLE DISTRICT COURT JUDGE AND JURY:**

This suit is brought by Black Plaintiffs, Jimmy Adams, Moses Agboola, Eric Azubuike, Drusilla Bailey, Deliah Brown, Felicia Rucker-Carter, Paulina Cary, Hyginus Chukwu, Ava Cosey, Terrence Crosby, Linda Denkins, Brigette Dennis, Charles Drayden, Lorlie Ellis, Ayoade Farinde, Jonah Ford, Rosalyn Francis, Cheryl Goode, Brandy Griffin, Shuleta Harris, Afrah Hassan, Quincy Henderson, Clennis High, Avis Horde, Erica Hubbard, Rodney Jackson, Vernita Jackson, China Jenkins, Michelle Johnson, Andrea Jones, Shalnadria Jones, Stephanie Jones, Ellamees Kelly-Molo, Elfreda King, Doris Lacey, Kimberly Mason, Debra McGaughey, Lue Mims, Kishma Moranice, Mary Page, Ruth Parham,  Beverly Perry, Fredrick Portis, Reynaldo Pradia, Erica Rhone, Debra Robinson, Tiffany Roubleau, Melody Dancer Samuels, Samoan Scott, Shonna Stoot, Leon Thibodeaux, Dorsetta Williams, Marcus Winters, and LaQuinta Vargas, complaining about Defendant Houston Community College (hereinafter identified to as either "HCC" or "College") for the following reasons[1]:

## I.
### INTRODUCTION

1.    When Cesar Maldonado was approved as the new Chancellor of HCC in 2014, he came armed with a racially discriminatory agenda.  Using his position as chancellor, Maldonado adopted a "transformation" plan for the College which disproportionately impacted  Black

---

[1] This lawsuit contains similar allegations to two other currently pending lawsuits filed against HCC, C.A. No. 4:21-cv-00686; *Austin et al. v Houston Community College*; pending in the United States District Court for the Southern District of Texas, Houston Division and C.A. No. 4:20-cv-02186; *Zelia Brown vs. Houston Community College, et al.*; pending in the United States District Court for the Southern District of Texas, Houston Division.

employees and Black employment candidates from advancement and/or hire at HCC. To implement his plan, Maldonado enlisted the help and cooperation of other lower level employees such as Tom Anderson and Janet May—two people who held key positions over HCC's talent and human resources departments.

2. Plaintiffs are but a few of the Black employees and applicants who became victims of Maldonado's racially motivated scheme. They were all targeted, mistreated, demoted, suspended, improperly investigated, falsely accused, not hired, and/or asked to admit to objectively false accusations manufactured against them, and when they objected or refused to be complicit in their own improper punishment, they were either improperly disciplined, written-up, not hired or promoted, and/or removed from the workplace—all because of their race.

3. This suit arises out of the deliberate acts of racial discrimination by Maldonado and his staff, undertaken in their decision-making and policy-making positions, on behalf of HCC. The complained-of practices and policies of the College treated non-Hispanic Black employees like Plaintiffs differently from Hispanic and White employees. The claims in this suit include damages resulting from retaliatory actions taken against Plaintiffs because of their race and/or for their participation in this lawsuit. Maldonado and his cooperating staff members, like May and Anderson, collectively acted in concert with one another under color of law to cause the harm and damages alleged in this suit. The conduct and policies of HCC violated Plaintiffs' rights protected in 42 U.S.C. § 1981 and enforceable under §1983 against HCC. Because HCC's discriminatory conduct is pervasive, systemic, widespread, and continuing against the Plaintiffs to this date Plaintiffs were victims of Defendant's pervasive discriminatory scheme. Plaintiffs also individually complain about retaliatory and discriminatory actions taken against them at and by Defendant because of their race—i.e., Black.

## II.
### PARTIES

Following are the named Parties in this suit:

**A.  Plaintiffs**

4.      Plaintiff Jimmy Adams is a resident of Pearland, Brazoria County, Texas.

5.      Plaintiff Moses Agboola is a resident of Houston, Harris County, Texas.

6.      Plaintiff Eric Azubuike is a resident of Sugar Land, Fort Bend County, Texas.

7.      Plaintiff Drusilla Bailey is a resident of Houston, Harris County, Texas.

8.      Plaintiff Deliah Brown is a resident of Houston, Harris County, Texas.

9.      Plaintiff Felicia Rucker-Carter is a resident of Fresno, Fort Bend County, Texas.

10.     Paulina Cary is a resident of Houston, Harris County, Texas.

11.     Plaintiff Hyginus Chukwu is a resident of Houston, Harris County, Texas.

12.     Plaintiff Ava Cosey is a resident of Houston, Harris County, Texas.

13.     Plaintiff Terrence Crosby is a resident of Houston, Harris County, Texas.

14.     Plaintiff Linda Denkins is a resident of Houston, Harris County, Texas.

15.     Plaintiff Charles Drayden is a resident of Houston, Harris County, Texas.

16.     Plaintiff Lorlie Ellis is a resident of Leander, Williamson County, Texas.

17.     Plaintiff Ayoade Farinde, is a resident of Houston, Harris County, Texas.

18.     Plaintiff Jonah Ford is a resident of Fresno, Fort Bend County, Texas.

19.     Plaintiff Rosalyn Francis is a resident of Missouri City, Fort Bend County, Texas.

20.     Plaintiff Brandy Griffin is a resident of Houston, Harris County, Texas.

21.     Plaintiff Cheryl Goode is a resident of San Antonio, Bexar County, Texas.

22.     Plaintiff Afrah Hassan is a resident of Houston, Harris County, Texas.

23.     Plaintiff Quincy Henderson is a resident of Manvel, Brazoria County, Texas.

24. Plaintiff Clennis High is a resident of Houston, Harris County, Texas.

25. Plaintiff Avis Horde is a resident of Houston, Harris County, Texas.

26. Plaintiff Erica Hubbard is a resident of Houston, Harris County, Texas.

27. Plaintiff Rodney Jackson is a resident of Houston, Harris County, Texas.

28. Plaintiff Vernita Jackson is a resident of Houston, Harris County, Texas.

29. Plaintiff China Jenkins is a resident of Humble, Harris County, Texas.

30. Plaintiff Michelle Johnson is a resident of spring Harris County Texas.

31. Plaintiff Andrea Jones Is a resident of humble Harris County Texas.

32. Shalandria Jones is a resident of Houston, Harris County, Texas.

33. Plaintiff Stephanie Jones is a resident of Pearland Brazoria County Texas.

34. Plaintiff Ellamees Kelly-Molo is a resident of Houston, Harris County, Texas.

35. Plaintiff Elfreda King is a resident of Rosharon, Brazoria County, Texas.

36. Plaintiff Doris Lacey is a resident of Houston, Harris County, Texas.

37. Plaintiff Kimberly Mason is a resident of Pearland, Brazoria County, Texas.

38. Plaintiff Debra McGaughey is a resident of Sugarland, Fort Bend County, Texas.

39. Plaintiff Lue Mims is a resident of Houston, Harris County, Texas.

40. Plaintiff Kishma Moranice is a resident of Katy, Harris County, Texas.

41. Plaintiff Mary Page is a resident of Houston, Harris County, Texas.

42. Ruth Parham is a resident of Houston, Harris County, Texas.

43. Plaintiff Beverly Perry was a resident of Houston, Harris County, Texas.

44. Plaintiff Fredrick Portis is a resident of Houston, Harris County, Texas.

45. Plaintiff Reynaldo Pradia is a resident of Houston, Harris County, Texas.

46. Plaintiff Erica Rhone is a resident of Houston, Harris County, Texas.

47.    Plaintiff Carrie Robinson is a resident of Houston, Harris County, Texas.

48.    Plaintiff Debra Robinson is a resident of Missouri City, Fort Bend County, Texas.

49.    Plaintiff Tiffany Roubleau is a resident of Houston, Harris County, Texas.

50.    Plaintiff Melody Dancer Samuels is a resident of Houston, Harris County, Texas.

51.    Plaintiff Samoan Scott is a resident of Houston, Harris County, Texas.

52.    Plaintiff Shonna Stoot is a resident of Pearland, Brazoria County, Texas.

53.    Plaintiff Leon Thibodeaux is a resident of Pearland, Brazoria County, Texas.

54.    Plaintiff Godwin Unuigbokhai is a resident of Katy, Harris County, Texas.

55.    Plaintiff LaQuinta Vargas is a resident of Houston, Harris County, Texas.

56.    Plaintiff Dorsetta Williams is a resident of Houston, Harris County, Texas.

57.    Plaintiff Marcus Winters, is a resident of Missouri City, Fort Bend County, Texas

**B. Defendant**

58.    Defendant Houston Community College—also sometimes referred to as the Houston Community College System ("HCC")—is a public education institution situated in Harris County, Texas. This defendant can be served by and through its Chancellor, Cesar Maldonado, who can be served at 748 W. 42nd St., Houston, TX 77018, or wherever he may be found.

**III.**
**JURISDICTION, VENUE, AND WAIVER OF IMMUNITY**

59.    This Court has federal-question jurisdiction over the alleged violations of federal-anti-discrimination laws, including but not limited to 42 U.S.C. § 1981 which is enforceable in this action under 42 U.S.C. §§ 1983, and pursuant to 28 U.S.C. § 1331.

60.     The conduct complained of in this suit concerns a generalized policy, custom and practice of conscious and deliberate racial discrimination, retaliation, harassment, and disparate treatment of non-Hispanic Blacks at HCC in violation of 42 U.S.C. §§ 1981 and 1983, which provides a cause of action and waiver of HCC's alleged immunity. The complained-of conduct was deliberate, willful, intentional, and clearly unlawful at the time of its occurrence. The referenced federal law provides for a private cause of action and waives the College's immunity and permits Plaintiffs to press their private claims in this suit against HCC.  Because the College accepts federal grant funding,[2] the College thereby expressly agreed to waive its sovereign immunity to the type of racial discrimination and retaliation claims Plaintiffs assert in this case. See Gruver v. La. Bd. of Supervisors for the La. State Univ. Agric. & Mech. Coll., 959 F.3d 178 (5th Cir. 2020) (governmental entity which accepts federal funds held to have expressly waived sovereign immunity as to discrimination claims).

61.     Venue is proper in the Southern District of Texas because the events complained about in this case substantially occurred in Harris County, Texas, and within the Houston Division. Additionally, the Defendant has its principal place of business in this District.  At least one or more of the Plaintiffs have satisfied all conditions precedent to bring the claims asserted in this suit, including exhaustion of pre-trial administrative opportunities to resolve this dispute, if any such acts were required.

## IV.
### BACKGROUND

62.     Plaintiffs are victims of a well-developed, systematic, entrenched, and wildly successful campaign of deliberate race and sex discrimination against non-Hispanic Black

---

[2] *See* Exhibit 1: Relevant pages from the HCC's 2019 Fund Report documenting its receipt and acceptance of federal funding at the College.  Such receipt of federal funds continued throughout the entirety of the period covered by this suit.

employees in various employee and leadership positions at HCC. This "campaign," led by Maldonado and implemented and enforced by a number of unsued supervisors at the College, is and was carried out with great efficiency and has resulted in the dismissal, demotion, displacement, and/or termination of Black employees at alarming and disproportionate rates. Maldonado and his henchmen target Black executives and employees to be removed or demoted, then subordinates manufacture false claims against the Black employees which then are purportedly "investigated"— which investigations manufacture objectively false claims against the Black employees—- resulting in their ultimate dismissal, termination or being victims of other adverse employment action. College subordinates like Thomas Anderson, Janet May, and Maya Durnovo, have participated in and/or have authorized false reports or charges against many of the Plaintiffs named in this suit, and approved these false reports even when the alleged wrongdoing was probably false. Janet May and others under her then carry out the displacement of the Black employees by either placing them on "leave of absence," "transforming" the employee out of their job, or the employee's position is "transformed" to a different title or eliminated all together, then the "vacancies" or "new positions" are filled by less qualified Hispanic or White candidates. Also, the slightest perceived rule infraction by a Black employee is exaggerated and elevated to a serious offense worthy of severe disciplinary action, "final write-ups," or termination; while similar and even more grievous infractions by Hispanic and White employees are ignored, treated as trivial, and/or are overlooked entirely. HCC has essentially put in place an effective "Displacement Plan" for Black employees which is pretextual to get around the appearance of racial discrimination when in fact it is utilized to discriminate against Black employees. Following are some of the more common components of the various discriminatory schemes used at HCC to rid itself of talented Black employees:

a. a Black employee is targeted for firing, disciplinary action, demotion, or removal;

b. allegations are manufactured with *false, exaggerated, excessive, or completely untrue* narratives about the Black employee which purports to claim the Black employee violated some HCC rule or policy;

c. an "investigation" is launched into the inflated or false charge;

d. the charade of an "investigation" is merely a pretext to place the Black employee under suspicion, placed on administrative leave, reassigned, or have their position eliminated all together;[3]

e. the Black employee is then confronted with the trumped-up charges and result-oriented investigation and the findings in the "investigation" are then used to "pad" the employee's personnel file for justification of further adverse employment actions against the Black employee; and

f. if the Black employee refuses to confess to the false and/or exaggerated charge(s), or otherwise tries to expose the injustice of the charge (for example, by filing an EEOC complaint, filing or participating in litigation against the College, or whistleblowing), they suffer multiple indignities such as being placed on forced administrative leave, deprived of promotions, placed under the supervision of unqualified employees whom the Black employees actually first trained, and/or being left out of meetings and ultimately terminated from their employment.

63.     HCC's Displacement Plan for Blacks has been so flagrantly used it has resulted in the displacement of 90% of the Black top-level executives/professionals who were at HCC when Maldonado came on as chancellor. Compared to the number of veteran Black employees who have been "transformed" or terminated out of their positions since Maldonado arrived, only 10% of comparably positioned White professionals have been displaced. Additionally, there has been a 50% increase in Hispanic hires and promotions to top level positions since Maldonado's arrival— many of which Hispanic hires and promotions were made to less qualified and less-experienced candidates.

64.     White and Hispanic employees are not systematically displaced like Black HCC

---

[3] Plaintiffs have evidence of HCC top-level officials requiring neutral or no-violation investigative findings against a Black employee being ordered to be changed to more negative findings even when facts do not support such findings.

employees.  Indeed, their transgressions are routinely ignored and go unpunished while Black employees accused of lesser or the same transgressions are disciplined more harshly, sent home, placed on leave of absence, placed under "investigation," and variously demeaned in the workplace.

65.     In less than six years at the helm of HCC, Maldonado's racist regime has succeeded in firing and/or removing all but a few top-level Black employees from their positions.  Many of the fired and removed Black employees have held their positions for decades while compiling exemplary work histories at the College before Maldonado's arrival.

### A.  Maldonado's Documented "Hispanic Preference" Agenda

66.     The massive displacement of senior level Blacks at HCC is not accidental.  Nor is the displacement of Blacks merely *de facto* discrimination (although it certainly is that)—it is much more premeditated and intentional as documented in an email string Plaintiffs have obtained.[4]

67.     Maldonado became chancellor in May 2014.  He is Hispanic.  He immediately set the College on a dramatic new racist course.  Within a month of being confirmed as the new chancellor, Dr. Ricardo Solis, a Hispanic Director at HCC, explained in writing that Maldonado would adopt policies and take actions to provide *preferential treatment for Hispanics*.  In an April 21-24, 2014 email string, Solis wrote to Maldonado congratulating him on his appointment.  Solis offered to provide the new chancellor with "the pulse of [the College] system" and invited him to have dinner soon.  Within days of that email, Solis wrote another Hispanic colleague at HCC the following prescient email reflecting Maldonado's racist agenda: "Now WE [Hispanics] will finally

---

[4] An authorized recipient of the email string supplied the emails to Plaintiffs.

get *preferential treatment*."[5]  Another recipient on the email string will testify in this case that he personally saw and participated in HCC interviews where more qualified Black employees were repeatedly not even considered while less qualified Hispanic candidates were put into positions they were not qualified to occupy. The Solis email string would soon prove true "*preferential treatment*" of Hispanics was going to be Maldonado's racist agenda.   Such a race-based policy is *per se* racist.

68.    Solis's emails could be dismissed as the wishful thinking of Maldonado's personal friend except that, as Solis was an HCC director at the time, his emails indicate the extent and forethought dedicated to the general policy that led to HCC's Displacement Plan, as well as his confidence in Maldonado's preferential program for Hispanics.  Moreover, Solis's prediction has proven to be factually true.  While Black employees in leadership and other roles have been uniformly reduced, less-trained and less-experienced Hispanics and Whites have flooded in to replace them.  The events since Maldonado's arrival only make sense when understood in the context of HCC's scheme of racial discrimination and retaliation against Black employees.

**B.  HCC's Racial "Displacement Plan" to Discriminate Against Black Employees**

69.    HCC's board of trustees, in practice, has delegated their power and authority to Maldonado, who in turn has admittedly assigned, delegated to, and acted in concert with his subordinates the right and authority to hire, investigate, discipline, and terminate the Black employees.[6]  Accordingly, Maldonado and the unsued defendants, Anderson and May, are and

---

[5] *See* Exhibit 2.  One of the recipients of these emails will testify that he personally observed intentional discriminatory decisions being made to hire multiple less-qualified White and Hispanic applicants over more qualified Black candidates.  There is also evidence that new HCC positions were promised to Hispanic or White hires before Black employees were ever notified that the positions were being posted or available for the Black employees to apply. Another scheme was to "eliminate" a position held by a Black employee, only to recast the same or similar job duties under a different title, then give the "new position" to a Hispanic or White candidate.

[6] In another racial discrimination lawsuit filed by a former Black HCC executive, Maldonado confirmed under oath that he simply relies on and accepts the recommendations of his underlings like Janet May and Thomas Anderson in

were the final decision-makers in many instances with respect to the employment policies and practices challenged in this suit.

70.    The common practices utilized by these executives yield one of three common outcomes:  (1)  Black employees relent to the false charges to keep their jobs, which action is then used to include a demerit in the employee's file justifying a demotion or is used as ammunition for additional adverse employment actions against the employee in the future; (2) the investigations, administrative leave, and harassment continues until the Black employee has no choice but to leave or resign their position; and/or (3) if the Black employees resist the incredible pressure placed of them, they are terminated, disciplined,  put on forced leave, or demoted.

71.    As part of this common discriminatory practice, Anderson and May have generally signed off on the alleged "investigations" of Black employees and, finally, "approved" the investigations even when they are knowingly false and/or objectively exaggerated.  Indeed, Anderson and May have routinely and customarily signed off on and implemented harsher punishments for Black employees than White and Hispanic employees accused of the same or more egregious policy transgressions, and Maldonado ratifies their decisions.

72.    Placing an employee on forced "leave of absence" is HCC's way of placing the employee under a cloud of suspicion suggesting they have engaged in a major act of wrongdoing. Since Maldonado's arrival, nearly 95% of the time when a Black person is given a forced "leave of absence" they have been ultimately terminated or demoted.

73.    Even more distressing is the fact that unsued executives Thomas Anderson and

---

terminating, disciplining,  and/or demoting employees.  *See* Maldonado's sworn deposition testimony in Cause No. 2015-77438, *Dr. Sabrina Lewis v. Houston Community College*, taken in the 269th District Court, Harris County, TX. While this testimony is not entirely true—because Maldonado himself instigated the directive by action and policy that Black executives are expendable—it is true that his directive is implemented with dispatch by May and Anderson to rid the College of experienced Black employees.

Janet May have changed and/or added *undated* policy changes in employee manuals which can later be used as a basis to dismiss or punish Black employees. This practice has actually been witnessed by a Plaintiff named in this suit. Such undated policy changes would make it difficult or impossible for employees to know what and when such changes became enforceable or were approved. Such a practice is contrary to accepted and approved College Human Resources practices.

74.    By April 13, 2015, Maldonado had implemented what he termed a "transformation" plan, which in effect was his way of displacing Blacks and hiring more less qualified Hispanic and White employees. HCC's publications pretend that its displacement of Blacks is merely undertaken as part of "transforming" the College to a better educational center. And, in a literal sense, they are in fact "transforming" the College—its upper tier supervisors and personnel are becoming whiter and more Hispanic at the unfair and discriminatory expense of Black employees. When Black executives are removed, their vacancies are disproportionately filled with less qualified Hispanic and White employees.

75.    Plaintiffs have evidence that the term "transformation" was a clever afterthought to mask the true intent of the plan—i.e., to get rid of more Black employees. Plaintiffs' counsel has located a witness who will testify that Maldonado and HCC eschewed the phrase "reduction in force" ("RIF") because such an approach to displace employees would be expected to proceed on a "last in-first out" basis or "point-score-calculation" method which would easily compare employees based on tenure and merit. Such neutral systems would not easily accommodate the goal of racial replacement of seasoned Black executives at the College. Instead, Maldonado decided on a "transformation" scheme which more easily accommodated his goal of displacing Black employees in favor of hiring more Whites and Hispanics.

76.　Proof of the success of the College's Displacement Plan in ridding itself of experienced Black employees is readily discoverable.  Following are but a few actual instances of how the discrimination plot has disparately impacted experienced Black employees at the College since Maldonado's arrival:

a.　45+ year employed top-level Black female, with decades of exemplary work at the College, passed over for a promotion for which she was the most qualified candidate and the position given to a less qualified 30-year-old Hispanic female.

b.　20+ year employed Black female, with prior exemplary work history, targeted for removal by the Administration and forced out of her position when her duties were "transformed" and given to a non-Black employee.

c.　25+ year employed Black female demoted, and ultimately forced out of her position without cause, when her job functions were "transformed" to non-Black employees.

d.　20+ year employed Black female working in a supervisory position, with exemplary prior work history, assaulted by a white female employee in the workplace, then targeted for removal by the Administration.  The white female who was the wrongdoer was allowed to remain employed—the innocent Black female supervisor who did not assault the white employee was fired.

e.　20+ year employed Black female targeted for removal by the Administration and forced out based on a manufactured false claim.

f.　22+ year employed Black female, with prior exemplary work history, targeted for removal by the Administration and forced out of her position under the College "transformation" plan.

g.　41+ year employed Black female passed over for promotion to an Executive Director position for which she was the best and most qualified.  A white male was given the position.

h.　Black female with 7 years' experience working at the College targeted for removal by the Administration and forced out after observing unethical purchasing practices by her Hispanic Purchasing Department Director without any corrective action being taken by the Administration against the Hispanic employee.  Only the Black female who complained was displaced.

i.　42+ year employed Black female at the College, and creator of the most successful online enrollment program at the College, targeted for removal by the Administration and was removed from her presidency at the NW College's North West campus and replaced by a non-Black hire.

j.  38+ year employed Black female at the College targeted for removal by the Administration and forced out and replaced by a non-Black employee.

k.  Black female with 8 years of employment at the College targeted for removal by the Administration and forced out and replaced by a non-Black hire.

l.  20+ year employed Black female at the College targeted for removal by the Administration and demoted to a low-level position related to "transformation."

m.  23+ year employed Black female at the College targeted for removal by the Administration and fired for reporting a terroristic threat by a white female co-worker in the workplace.  The report was made to the College's police department consistent with policy.  The Black female was fired for reporting the white female's threats to the College's police department while the white female was allowed to remain employed.

n.  25+ year employed Black female at the College filed a sexual harassment claim with the College against her white supervisor. She was "investigated" and made to remain under the management and supervision of the white male offender. No known corrective or disciplinary action has been undertaken against the white supervisor.

o.  11+ year employed Black male properly corrected a white female vendor who was being disrespectful to subordinates in his department.  The white female lodged a false claim of sexual harassment against the Black male.  The Administration's investigator told the Black male that he found the white female's word more credible even though there were multiple witnesses corroborating the Black male's side of the story and no credible corroborating witnesses for the white female's story.

p.  a Black female, after 4+ years of superlative work at the College, was targeted for removal by the Administration and removed from campus, placed on mandatory leave of absence, demanded to admit to a false claim that she created a hostile work environment if she wanted to keep her job—a demand she rejected, retaliated against for reporting the College's misuse and suspected theft of federal grant dollars, and ultimately replaced by a woefully unqualified Hispanic male.[7]

77.    In isolation, or in any particular case, the discriminatory program behind HCC's

Displacement Plan/"Transformation" program might be difficult to decipher.  However, when

---

[7] The Hispanic male who replaced  the experienced Black female had zero experience or training in grant compliance even though the College's job description for the position required multiple years of actual experience in grant management and grant compliance.  Brown was qualified for the position—the Hispanic male was clearly not. *See* Exhibit 3.

Page **15** of **76**

viewed over years of implementation, the commonality and "success" of the discriminatory scheme against Blacks comes into clear view. There are both objective and subjective data proving the College's disparate and discriminatory treatment of Black employees since Maldonado's arrival.

### C. Individual Plaintiff Allegations of Black Plaintiffs

78. Jimmy Adams - Dr. Adams supervisor has moved for his removal based on unfounded complaints of insubordination, untrustworthy, and being unreliable, to name a few. Dr. Adams was subjected a false write-up by his white supervisor to pad his file and ripen hm for termination. The genesis of the write-up was retaliation in response to his complaining about his supervisor to other individuals at HCC and him being out on FMLA for hip surgery. After further harassment, Dr. Adams called the OIE and spoke with David Cross about filing a complaint against his supervisor for bullying, harassment, and creating a hostile work environment which makes it difficult for an individual/team to get their work done. Rather than accommodating Dr. Adams complaint, David Cross tried to get Dr. Adams to drop the complaint. Unfortunately, this is an all too familiar tactic at HCC. When a black individual wants to file a complaint about a supervisor, rather than follow HCC policy, the black individuals are viewed with skepticism and asked to reconsider filing the complaint. Such treatment is not common with other white and Hispanic individuals at HCC. After not finding success with David Cross, Dr. Adams called Talent Engagement's hotline and filed a complaint. The "anonymous" complaint was forwarded back to David Cross. Now the complaint still sits with David Cross, but nothing has been done. To date,

Talent Engagement told Dr. Adams that his file is still with David Cross. Dr. Adams finds himself in the midst of the employment displacement plan, i.e.:

a. Black employee is targeted for firing, disciplinary action, demotion, or removal;

b. allegations are manufactured with *false, exaggerated, excessive, or completely untrue* narratives about the Black employee which purports to claim the Black employee violated some HCC rule or policy;

c. an "investigation" is launched into the inflated or false charge;

d. the charade of an "investigation" is merely a pretext to place the Black employee under suspicion, placed on administrative leave, reassigned, or have their position eliminated all together;

e. the Black employee is then confronted with the trumped-up charges and result-oriented investigation and the findings in the "investigation" are then used to "pad" the employee's personnel file for justification of further adverse employment actions against the Black employee; and

f. if the Black employee refuses to confess to the false and/or exaggerated charge(s), or otherwise tries to expose the injustice of the charge (for example, by filing an EEOC complaint, filing or participating in litigation against the College, or whistleblowing), they suffer multiple indignities such as being placed on  forced  administrative leave, deprived of promotions, placed under the supervision of unqualified employees whom the Black employees actually first trained, and/or being left out of meetings and ultimately terminated from their employment.

More so, when Dr. Adams tried to complain pursuant to HCC's internal grievance procedures, he was stonewalled from doing so, something that does not occur when other White or Hispanic individuals have similar complaints.  Rather, Dr. Adams has not been afforded the opportunity to address his complaints through HCC's written policy, as they are selectively enforced, or not followed, when it comes to Black HCC employees.

79. Moses Agboola Race discrimination: Pay Disparity/Promotion/Harassment/ Advancement Denied.  Mr. Agboola works in HCC's IT department. Mr. Agboola, and the three other black co-workers in his department are faced with constant harassment and discrimination from their supervisors, Saul Marroquin, and the Lead Tech (Assistant Manager) Antonio Quintero,

both Hispanic males. Additionally, despite Mr. Agboola's qualifications, managerial positions in the IT department are awarded to less qualified and less experienced Hispanic individuals as opposed to qualified black employees. Mr. Agboola is also paid less than his Hispanic co-workers despite his qualifications and experience. He lost income due to the reversal of his title and position from Technology Coordinator to Senior Hardware/Software Technician, and he has been at the end of his current Professional Pay grade level since 2017. He was not offered any explanation from his Hispanic manager as to why his senior role was taken away from him and awarded to a less qualified Hispanic individual.  He has experienced selective and bias treatment based on his age and racial discrimination from his Hispanic supervisors.  His Hispanic manager also made a statement in a meeting at the "Fraga Campus" in which Mr. Marroquin stated that the "Hispanics' were going to be running things, and this appears to be the case.

80.     Eric Azubuike - Race discrimination: Pay Disparity/Promotion/Advancement Denied.  Dr. Azubuike served as an adjunct faculty member for HCC.  He applied for many full-time positions at HCC.  Many of the jobs he applied for were awarded to White or Hispanic candidates despite Dr. Azubuike's excellent work history at the College as a part-time instructor. Dr. Azubuike's white supervisor also informed Dr. Azubuike that there were no openings for adjunct positions in the criminal justice department. Following Dr. Azubuike's investigation, he learned that mostly white police officers were hired and assigned classes to teach in the Criminal Justice Program even after Dr. Azubuike was informed that no openings were available, a trend continuing today. Dr. Azubuike, a black Ph.D. degree holder, was overlooked in favor of less educated white applicants and was specifically told by his white supervisor that no position was available, wherein reality, these positions were available and were being awarded to white police officers.  Dr. Azubuike was qualified to be hired in most, if not all, of the position for which he

had applied but was never even afforded the opportunity to advance, because these positions were just given away to white police officers rather than following standard hiring protocols.

81.    Drusilla Bailey - Race discrimination: Pay Disparity/Promotion/Advancement Denied. Ms. Bailey is an adjunct professor at HCC.  Despite continuing to receive excellent student evaluations and outstanding professional evaluations from Department Chairs, she has failed to receive full time employment while other less qualified and experienced white and Hispanic employees are offered full time positions. A former department chair once stated to Ms. Bailey that "all his problems with students were Black students, and, all his problems with faculty were Black faculty."  Due to racially charged sentiments like this held by higher ranking HCC employees, Ms. Bailey has been unable to attain full time status as a professor at HCC and faces pay disparity as compared to other white and Hispanic co-workers.  With such open and blatant racial remarks being made by Ms. Bailey's non-black supervisors, she has found it virtually impossible to advance HCC's ladder.  She is also paid less than her white and Hispanic counterparts despite having comparable or advanced experience and education.

82.    Delilah Brown - Race Discrimination: Denied promotion/advancement/Pay disparity - Deliah Brown has been employed with HCC for one and a half decades. She has repeatedly applied for numerous full-time positions. Between 2014 and 2020, Ms. Brown applied for more than 50 HCC openings. Despite being a veteran and having a master's degree in History and Sociology, HCC has not offered her a full-time job.  Ms. Brown has observed that the majority of the hiring committee individuals that she meets with are either white and/or Hispanic, and there are very few Black individuals that are a part of the HCC hiring committees for her department. She is more than qualified for positions she applied for, however these positions are overwhelmingly awarded to less qualified and less experienced white and Hispanic individuals.

As Ms. Brown is a veteran, HCC typically provides a 5-10-point military veteran preference when applying for these positions.   For instance, if her education and experience total 15 points, generally she will receive an additional 5-10 points, which would serve to give her an edge if she were applying for a position with others of comparable experience.   However, it is Ms. Brown's understanding that HCC has not been providing her with these additional points in order to hire less qualified and less experienced Hispanic individuals. Ms. Brown has also researched this particular topic and found that the majority of full-time employees at HCC are white and Hispanic and that the Black employees are more heavily placed in part-time or adjunct positions.  Ms. Brown is also paid less than her white and Hispanic counterparts despite having comparable or advanced experience and education.

83.     Paulina Cary - Race  discrimination:  Pay  Disparity/Promotion/Workload Disparity/Advancement Denied. Ms. Cary is a faculty member at HCC and is the only black female in her discipline (Criminal Justice).   Ms. Cary's department head, a white male, has not assigned Professor Cary any overload courses, even though her white male co-workers are given multiple overload classes.  This prevents Ms. Cary from earning as much as her white co-workers despite her comparable qualifications and experience.  Ms. Cary previously filed a complaint against the department head regarding the unfair method of class assignments to no effect.    Despite her experience and qualifications, she is constantly denied the opportunity to teach specific classes by her supervisor, yet these requests are usually granted to the other White and Hispanic professors in her discipline.  Her pay is also less than White and Hispanic co-workers with comparable or less tenure.

84.     Hyginus  Chukwu - Race  Discrimination: Adverse policy action/Retaliation - Hyginus Chukwu was a 15-year employee at HCC. HCC terminated him with a vague and

manufactured claim that he had violated some unspecified HCC policy. He later found out that HCC claimed that he had sexually harassed students, but no sexual harassment finding was ever made against him. He was terminated from HCC and told that he was ineligible for rehire however other Hispanic and White individuals who have also been terminated due to alleged sexual harassment have been allowed to return to HCC. Rather Dr. Chukwu has been painted as a stereotypical black sexual deviant although there is no finding to support such a claim. HCC failed to identify any policy that he supposedly violated. He alleges he was terminated because of HCC's racist agenda against Black employees as the pattern of the racial discrimination plan follows exactly what happened to him:

a.      a Black employee is targeted for firing, disciplinary action, demotion, or removal;

b.      allegations are manufactured with *false, exaggerated, excessive, or completely untrue* narratives about the Black employee which purports to claim the Black employee violated some HCC rule or policy;

c.      an "investigation" is launched into the inflated or false charge;

d.      the charade of an "investigation" is merely a pretext to place the Black employee under suspicion, placed on administrative leave, reassigned, or have their position eliminated all together;

e.      the Black employee is then confronted with the trumped-up charges and result-oriented investigation and the findings in the "investigation" are then used to "pad" the employee's personnel file for justification of further adverse employment actions against the Black employee; and

f.      if the Black employee refuses to confess to the false and/or exaggerated charge(s), or otherwise tries to expose the injustice of the charge (for example, by filing an EEOC complaint, filing or participating in litigation against the College, or whistleblowing), they suffer multiple indignities such as being placed on forced administrative leave, deprived of promotions, placed under the supervision of unqualified employees whom the Black employees actually first trained, and/or being left out of meetings and ultimately terminated from their employment.

85.      Ava Cosey - Race Discrimination: Demotion/Income Loss/Retaliation - Ava Cosey

is a long-time HCC employee who has been denied equitable pay for the work she has performed over the years compared to a white female coworker, Karin Hutchins – who did not have to file a grievance to get escalated pay. Ms. Cosey personally met with Chancellor Maldonado regarding this issue along with Janet May. When nothing was done, she met with the HCC Board of Trustees where Chancellor Maldonado was again present. Following her grievance, she was sent correspondence by HCC to stop pursuing any type of relief on this issue. In fact, she was informed that she could no longer file any type of grievance related to the pay discrepancy between her and white counterpart despite the fact that Ms. Cosey had better qualifications and experience. Ms. Cosey was also not afforded the opportunity for advancement within her department as HCC would eschew the formal hiring process in order to selectively place white and Hispanic individuals into positions on an interim basis. Eventually, these interim employees would be allowed to stay in the position full time effectively preventing Ms. Cosey and other qualified black candidates from ever being considered for the positions. Also, she filed a sexual assault claim against a friend of David Cross (Director EEO Compliance, Title IX Coordinator, Office of Institutional Equity and Diversity at HCC) and has suffered retaliation ever since. She has been demoted, denied advancement, denied stipends for extra work that is regularly afforded to white and Hispanic employees, and has been denied having her job title, compensation, and classification augmented to reflect the actual work that she is doing, something that was done for her white co-worker.

86.    Terrence Crosby - Race Discrimination: Denied promotion/advancement and equal pay - Terence Crosby is a 3-year HCC employee. He has applied for four different positions (Tech II (twice), Tech III, and Quality Assurance Coordinator). Manager Marshal Heins informed him he did not qualify for the promotions even though they are the very same jobs he is already doing

as a Tech I but with higher pay. Mr. Crosby worked during the pandemic, but neither HR nor his managers will approve essential pay as they have approved for other white and Hispanic employees.  Since his hire, he has applied for promotions to Tech 2, Tech 3 and Quality Assurance Coordinator. One such time was at the request of his supervisor and he still did not get the promotion. When Mr. Crosby asked why he was not being hired for the position and was told that he does not have credentials– the other person (a non-Black) got the position because he had a boiler certificate. But, having a boiler certificate was not a requirement of any of the positions for which he applied. When applying for other positions, he was told that he had not been with the company long enough – then a non-black individual was hired "off the street" from Amazon. He was ultimately told he was better suited for Tech II but was not hired when he applied twice in favor of less qualified and less experienced non-black employees. When his supervisors call campus managers to check on his performance, they all say that he does good work.  Mr. Crosby is often asked to help the non-black Tech II and Tech III because of his knowledge and experience and who he is also responsible for training, but he himself cannot be promoted to one of those positions despite his tenure and qualifications.  Essentially, Mr. Crosby is capable enough to train the Hispanic and White employees on how to be a Tech II or Tech III, and he is also tasked with physically completing that work, however he is no qualified enough to actually be placed in that position along with the added salary and benefits that would come along with it.

87.    Linda Denkins - Race discrimination: Denied promotion/ advancement/ Demotion/Income Loss/Retirement Loss - Linda Denkins was a 40-year+ employee of HCC. HCC moved counselors from the faculty pay scale to a lower pay scale which caused Ms. Denkins to lose thousands of dollars of income. Greater than 50% of the counselors at HCC were black counselors so this reduction disproportionately affected black employees as compared to white

and Hispanic employees. Most of the white and Hispanic replacements brought into the department after Maldonado's arrival did not have degrees in counseling, even though it should have been a requirement for the position.  Though Ms. Denkins applied for several other positions in the following years, HCC hired Hispanic individuals instead despite the fact she was more qualified and had far more years of experience. She stopped applying for any positions because it was clear HCC would hire a less-qualified Hispanic for the job.  HCC "transformed" Ms. Denkins' job and lowered her pay and status while other Hispanic and white individuals were able to keep their current positions and salaries. Ms. Denkins was constructively discharged because she was humiliated and forced to resign to avoid losing retirement income with each demotion and pay reduction.  This sadly was an occurrence for many of the black counselors at HCC after Maldonado arrived as only predominantly white and Hispanic counselors were allowed to retain their position or were transferred to other comparable positions whereas the black counselors were forced to either accept lower positions with less salary or leave the college all together.

88.    Charles Drayden - Race discrimination: Mr. Drayden is a licensed attorney who worked for HCC for seven years as an adjunct professor. He applied for several full-time positions but was repeatedly denied promotions/advancements even when he was the most qualified.  He also was removed from his adjunct position while other Hispanic and Caucasian professors were allowed to remain with college. HCC initially advised that they had an accreditation issue, utilizing professors that had a Juris Doctorate teaching American Government classes. The rules governing any concern regarding qualifications in these matters can be addressed with the entity addressing accreditation. It specifically provides an opportunity to address these concerns with the qualifications of each individual. Mr. Drayden is a practicing attorney. He has represented public entities, is a registered lobbyist on the federal, state and local levels. He also tried cases to the

United States Supreme Court. Despite his qualifications and that he taught American Government for almost 7 years at HCC, he was unceremoniously denied continued employment while other White and Hispanic professors were allowed to continue teaching. Additionally, all the American Government professors with the Juris Doctorate degrees were African American or most of them were. HCC used the accreditation story as a pretext to eliminate African American professors, particularly lawyers, who would not be around to address other issues they had with African Americans in their system. When advised of the accreditation issue, he requested an opportunity to speak with accreditation officials and was repeatedly denied.

89.    Lorlie Ellis - Race discrimination: Denied promotion/advancement - Ms. Ellis worked in several positions at HCC. She faced constant harassment and retaliation from her supervisors, especially after Maldonado arrived.  During her time at Houston Community College she complained to Janet May and Diana Pino (Hispanic Female) of issues in the Veteran Affairs department.  Despite her repeated attempts to have these individuals address her concerns, she was constantly denied without explanation.  She personally observed the complaints of other white and Hispanic employees handled by Ms. May and Ms. Pino, but Ms. Ellis was selectively denied despite her claims mirroring some of the other white and Hispanic employees in violation of written HCC policy.  After voicing her concerns to Ms. May and Ms. Pino, Ms. Ellis noticed that her advancement within HCC came to a grinding halt. Ms. Ellis applied for several positions at HCC but was never even offered an interview. To improve her prospects, she obtained a doctorate and applied for additional jobs within HCC also to no avail.  Despite her advanced educational background and tenure at HCC, she was paid less than other less-qualified White and Hispanic individuals.  She was forced to watch as White and Hispanic employees with less qualifications than her were placed into positions that Ms. Ellis applied to without ever receiving any

consideration for the position. Without any path available at HCC to advance, and seeing the writing on the wall, she was forced to resign. Since leaving HCC, Ms. Ellis has applied for positions with HCC and never received an interview and received no notice that the position closed until months later.

90.    Ayoade Farinde Race discrimination: Pay Disparity/Promotion/Advancement Denied/Adverse Employment Action. Ms. Farinde was an adjunct professor at HCC. Despite continuing to receive excellent student evaluations and outstanding professional evaluations from Department Chairs, she has failed to receive full time employment while other less qualified and experienced white and Hispanic employees are offered full time positions. She had worked at HCC since 1979 and up until the Fall of 2020, she was a part-time instructor. Without explanation, she was not provided teaching positions in the Fall of 2020, Spring of 2021, and Fall of 2021. In August 2021, someone submitted a form on her behalf with the subject heading: End of part time assignment for Ayoade Farinde Form #2281. Ms. Farinde was shocked by this as the white and Hispanic adjunct professors had no forms submitted on their behalf. The other white and Hispanic individuals were also allowed to continue teaching their classes during those semesters, but Ms. Farinde had been selectively excluded despite her years of service and good performance reviews. It was clear to Ms. Farinde that she was being targeted for termination as she was the only individual that had this form submitted on her behalf.

91.    Jonah Ford - Race discrimination: Pay Disparity/Promotion/ Harassment/ Advancement Denied. Mr. Ford works in the Campus IT department as a technician for the Northeast College at HCC. Mr. Ford, and the three other black co-workers in his department are faced with constant harassment and discrimination from their supervisors, Saul Marroquin, and the Lead Tech (Assistant Manager) Antonio Quintero, both Hispanic males. Additionally, despite

Mr. Ford's qualifications, managerial positions in the IT department are awarded to less qualified and less experienced Hispanic individuals as opposed to qualified black employees. Mr. Ford is also paid less than his Hispanic co-workers despite his qualifications and experience.  Whenever Mr. Ford attempts to address these issues with his Hispanic supervisors, he is either ignored or given the runaround where ultimately nothing ever comes to fruition.  In (May 2018) the senior tech at the (Pinemount Campus) retired. Jose Gonzales (a Hispanic) who Mr. Ford taught and trained was put in charge of that campus instead of him who had more years and experience. Mr. Ford was told by Mr. Marroquin that he needed the "senior tech" to be at the "Pinemount campus" And that Jose had already been doing the job there. This was his way of saying there was no point in Mr. Ford applying because he was going to give the job to Jose. Jose even told Saul that Mr. Ford was more qualified for the job. But Saul didn't care because he wanted a Hispanic. This position would have been a significant raise in pay and responsibility for Mr. Ford.  Saul also made a statement in a meeting at the "Fraga Campus" in which Saul stated that the "Hispanics' were going to be running things. In (august 2018) Saul Marroquin decided he was going to move Mr. Ford from his current location by having his coworkers all "vote" on what location he would be going to. He did this in order to embarrass and belittle Mr. Ford. His coworkers responded by telling him this was not their job and it was not right for them to vote on that and they wanted no part of it. However, he insisted that they do so anyway. Saul again choose to shame and harass Mr. Ford while he was on FMLA. HCC policy is to notify your manager when you will be out. It is the manager's soul responsibility to notify anyone else. But while Mr. Ford was on intermittent FMLA whenever he would call off Saul insisted that he call each of his coworkers and inform each of them that he would not be at work. This harassment resulted in him only taking minimal time off, instead of the time he needed to take because of the constant pressure and harassment from Saul

to be at work. At the time Mr. Ford was on intermittent "FMLA" a meeting was held to with a Hispanic HR representative, Alix Alvarado.  In that meeting, one of Mr. Ford's coworkers (Osvaldo Waldo) disclosed that Saul had discussed private details of Mr. Ford's FMLA with him and had blamed Mr. Ford being out for the technical problems at a different campus. Mr. Ford stated that was illegal and Ms. Alvarado replied stating that "but, you would have to prove it". Following that incident, there was another in which the Lead Tech position held by Mr. Quintero was required to have or obtain and A+ certification within one year of gaining the position which he never did. Mr. Ford already has an A+ cert and the qualifications for the job. When Mr. Ford made compliant to his Mr. Marroquin that Mr. Quintero had not met the qualifications required for the Lead Tech position, Saul ignored the compliant. In a department meeting in (late 2018) at the "Southeast Campus" Mr. Quintero (the assistant manager) became combative and berated Mr. Ford by yelling that he was "lazy" (a common black stereo type) and he didn't do anything. This was false, and Mr. Ford's coworkers defended him. Saul was also present for that meeting. In another meeting shortly after that in (early 2019) also at the "Southeast Campus" Mr. Quintero stated that the older black employees needed to be moved because they were too old to do their jobs. The manager Saul Marroquin was standing right there at the time and didn't object to anything he said.

92.     Rosalyn Francis - Race discrimination: Denied FMLA and Disability/Forced resignation/Impartial application of HCC policy - Ms. Rosalyn Francis worked in a teaching position at HCC for 15 years. Ms. Francis noticed that her Hispanic supervisor Kathleen Anzivino, seemed to treat herself and other Black employees differently than how she treated other white and Hispanic employees.  Specifically, she would send confrontational emails specifically to Black individuals and would also constantly check on Ms. Francis and the other black individuals to

ensure they were in their offices.  This was not done to the other white and Hispanic employees in the department. Though she was displaced and qualified for medical leave, Kathleen Anzivino and Rima Adil refused Ms. Francis's FMLA request. Although she even provided her supervisors with medical notes and information from doctors, they instructed her to return to work or suffer termination, something that is not demanded of white or Hispanic employees when they request FMLA leave. HR informed Ms. Francis that her long-term disability would not be approved, and she must return to work. Essentially, HCC chose to selectively enforce, or rather not enforce, their written FMLA policy when it came to Ms. Francis, although other white and Hispanic individuals did not face the same issues.  Having no other options available, Ms. Francis was constructively discharged when she was forced to resign. Ms. Francis was able to teach again at HCC in 2019, but she was only brought in as a part-time instructor though and taught only two classes in the Fall of 2019 before being laid off due allegedly to lack of available courses. Despite this allegation that there were not enough courses, HCC went on to hire new white and Hispanic employees to teach adjunct classes after informing Ms. Francis of the opposite.

93.    Cheryl Goode - Race discrimination: Denied employment opportunities – Ms. Goode applied for numerous positions within HCC for which she was qualified but never received a callback or job offer.  Despite her qualifications and educational background, these jobs were routinely given to other white and Hispanic applicants who did not have the same qualifications, educational background, or experience as Ms. Goode.  Numerous qualified Black applicants are simply ignored at HCC in favor of less qualified white or Hispanic applicants.

94.    Brandy Griffin - Race discrimination: Pay disparity/Denied promotion/ advancement/ False/unwarranted disciplinary actions - Brandy Griffin is a long-term employee of HCC's Police Department. Her pay is less than White and Hispanic officers with comparable or

less tenure despite her qualifications. The pay disparity became more evident when HCC implemented its Displacement Plan and changed the pay scales.  Black officers with many years of service and experience, like Officer Griffin, earned less than White and Hispanic officers. Black officers are disciplined more harshly for the same or similar policy violations as White and Hispanic officers. In June 2020, Chief Cunningham placed Ms. Griffin on five-day suspension without pay and revoked her extra job privileges because she asked if an assignment may have been racially motivated. Rather than listening to her grievance, she was instead retaliated against by having her extra job duties taken away preventing her from earning a supplemental income. Officer Griffin has found that whenever she tries to address any racial impropriety within the department, she is met with adverse employment actions such as being written up, suspended without pay, or having her ability to work extra jobs removed.  When Black police officers such as Officer Griffin complain to HR, HR sends the complaints back to the supervisors without investigating, which results in further retaliation against the reporting officer. A Hispanic officer, Captain Martinez, falsified TCOLE records so that other Hispanic officers could get promotions and pay increases. Because of this, Officer Griffin lost out on employment opportunities because of the unfair advantage provided to the other Hispanic officers.  Captain Martinez was allowed to stay on at the department for months before the department suspended him. In 2019, the department fired a former Black police officer for manipulating time and attempted to file criminal charges against him but took no such actions against Captain Martinez for his  falsification of TCOLE records. Ms. Griffin is constantly being retaliated against and harassed by both Chief Cunningham and Captain Boxie for minor transgressions whereas other White and Hispanic officers are afforded more leeway. Specifically, she had her ability to work extra jobs taken away based on an unsupported allegation, whereas Hispanic officers have been allowed to continue

working extra employment until an actual finding is made against them.  Because Officer Griffin has spoken up about the racial improprieties plaguing the HCC police department, she has now become a target by leadership and faces harassment on a daily basis.  Ultimately, Officer Griffin and the other PD officers were informed by one of their supervisors that if they chose to participate in this present lawsuit, that would result in problems for the officers, including termination.

95.    Afrah Hassan - Race discrimination: Pay Disparity/ Workload Disparity /Retaliation - Afrah Hassan is currently the Associate Dean of Student Engagement and Success at the SW College (Missouri City and Stafford), a position she has held since 2017. In April 2018, Ms. Hassan discovered that her comparable Hispanic coworker earned $8,000 more than she despite Ms. Hassan being more qualified. Interestingly, Ms. Hassan was the only individual in her department omitted from the HCC board meetings, but all her counterpart's names and salaries were listed. Ms. Hassan felt that this singling out was retaliation for her sharing her concerns of racial impropriety with her supervisor.  Ms. Hassan has also witnessed the discrimination of other black employees at the school. Ms. Hassan and Dean Garza interviewed Latina King (an African American), two other African Americans, an Asian, and Anamaria Lopez, a Hispanic, for an Enrollment Service Officer position. After the interviews, Ms. Hassan shared her concern with Dean Garza about the candidates' inability to effectively execute the job duties, work performance, and commitment to the position. Latina King, the Black female, had the best interview out of all the candidates, based on her responses and knowledge base.  Anamaria Lopez appeared to know the interview questions beforehand and answered as if she already knew the next question. Ms. Lopez, however, had no prior enrollment services or supervisory experience which was a requirement for the job. HCC rated the candidates on a numbering system. Latina King had the required experience and scored higher than Ms. Lopez. However, Dean Garza selected Ms. Lopez

for the job over the better qualified Black female. Ms. Lopez has advanced to handle duties ordinarily handled by an Associate Dean, such as interviewing new hires. As a result, there are an increasing number of Hispanics with little to no experience being hired in Student Services. These individuals prioritize Hispanic student enrollment and customarily make disparaging comments about Black students. When Hassan complained about the racist comments about Blacks, Dean Garza intervened to clear the Hispanic female that made the disparaging remarks about Black students. Since voicing her concerns, Ms. Hassan is being retaliated against for standing against the open racial discrimination at HCC against Black applicants and Black students. Her advancement at HCC has since become stagnant and she is being required to take on more and more work without additional benefits or compensation as compared to her White and Hispanic counterparts. Regarding these issues, she voiced her concern to her Hispanic supervisor, Matias Garza about the inequity in work load and duties. Her duties were heavier than her Hispanic and White counterparts even though the work should have been equally shared. Many of the duties were not the role of the Associate Dean but were rather the role of the Dean of Student Success, Matias Garza himself. Ms. Hassan was required to cover her seven (7) direct reports, 3 campuses, plus a new program called PSOAR that she was overseeing, while her Hispanic and Caucasians counterparts had three direct reports, two (2) campuses, and no special projects. When she shared this concern with the Dean, he told me" to hang in there "and offered no resolve. Ms. Hassan feels that if she would have not raised these concerns regarding the mistreatment of her and other Black employees at HCC, then she would have had more success in advancing within the college. But, as she chose to speak out against the racial improprieties at the school, she has now become a target in the racial discrimination displacement plan of Cesar Maldonado and is being sandbagged with additional work outside of the scope of her employment.

96. Quincy Henderson - Mr. Henderson notified his manager that his partner's grandmother was hospitalized with a broken hip and he provided care for her. This caused him to come in late from time to time, yet within HCC's grace policy. Management would repeatedly send him emails about being at work on time. HCC has a 7-minute grace period. He would always arrive within the grace time and was told even thought that was well within the policy, he should not be doing that. Yet, other white and Hispanic employees who also arrived within the grace policy were never accosted as Mr. Henderson was. His white supervisor would also retroactively augment Mr. Henderson's schedule in attempts to make it appear as though he was late or left early despite that not being the case. A week prior to him questioning her, his work was praised but things had soured after he addressed this issue with his supervisor. After that, his supervisors would request information from him that they knew he could not access in an effort to make him look insubordinate and ripen him for termination. He had to ask other employees for the information in order to complete his work. Eventually, his PeopleSoft access was taken away from him making it virtually impossible for him to effectively complete his job requirements. When Mr. Henderson attempted to address these issues with his White manager, he was told that he just needs to get along with her and follow her instructions without question. His manager would then begin sending him work assignments with unreasonable deadlines that Mr. Henderson could not reasonably meet. Such actions were not taken against other white and Hispanic individuals in the department but singled out Mr. Henderson directly. Seeing the writing the wall on realizing that he was being targeted for termination, Mr. Henderson was eventually forced to resign due to the constant harassment from his white supervisor.

97. Clennis High Race discrimination: Pay Disparity/Promotion/Demotion/Workload Disparity/Advancement Denied. Dr. High was a Counselor at HCC that was eventually forced into

retirement Upon Maldonado's arrival, HCC downgraded Dr. High and other HCC Counselors to advisor roles.  This demotion resulted in a $24,000 reduction in salary for Dr. High. Greater than 50% of the counselors at HCC were black counselors so this reduction disproportionately affected black employees as compared to white and Hispanic employees. Most of the white and Hispanic replacements brought into the department after Maldonado's arrival did not have degrees in counseling, although they were required for the position.  Dr. High was forced to retire from his full-time position and teach adjunct following the demotion.  Even after his departure from full-time, Dr. High still faced discrimination as an adjunct professor.  Despite his multiple requests to teach particular classes within the sociology department and his qualifications to do so, he has been constantly denied while these considerations are afforded to other White and Hispanic adjunct professors.  Also, his requests to teach at Northline Campus and Northeast Campus were also denied and he has never been given a reason for why he could not teach at these areas. Similar considerations are afforded to white and Hispanic adjunct professors, but all of Dr. High's requests were denied by his white female supervisor without reason or explanation.

98.    Avis Horde – Race discrimination: Casualty of Transformation/Reduced salary/ Income loss/Denied opportunity to retain to current work status/Loss of retirement income – Ms. Horde began working at HCC on November 21, 1994. Prior the arrival of Maldonado, her career progression had been steady, and she had progressively moved up the ladder with each promotion, she also received good to exemplary reviews throughout her tenure at HCC. However, after Maldonado's arrival, on July 25, 2017, Dr. Athos Brewer, Vice-Chancellor of Student Success, Dr. Irene Porcarello (now deceased), formerly the President of the Southeast College, Satrice Morris, Human Resources Representative, and another Human Resources Representative called a meeting with Ms. Horde to let her know that HCC had eliminated/"transformed" her position. She

was not given the option to be laterally transferred to another job on the same pay grade even though positions were open and advertised. Other white and Hispanic individuals in her department were moved to comparable positions elsewhere at HCC, however she was singled out and informed that she needed to apply for new positions. She applied for 26 HCC jobs and received no offer comparable to her previous job. She took a position earning approximately 50% of her prior HCC salary. Because of this Ms. Horde has lost over $100,000 in salary since her demotion. Ms. Horde noted that a more concerted effort seemed to take place to ensure that her white and Hispanic counterparts were provided with comparable new positions at HCC, whereas Ms. Horde and the other black individuals were essentially left to fend for themselves. In addition to the amount of money she lost in compensation, her annual retirement annuity is also impacted by the reduction in her annual salary. In the Texas Teacher's Retirement System, her annual retirement annuity is based her last five highest years' salary. Ms. Horde believes the retaliation may have been in response to her serving as a character witness to other black individuals who filed grievances at HCC for discrimination.

99.    Erica Hubbard – Ms. Hubbard is the Director of Library Services at HCC. On one occasion, Captain Boxie entered the library and demanded to speak with Ms. Hubbard about an issue. Captain Boxie then stated that he had been reviewing video footage from the library and concluded Ms. Hubbard's staff is calling HCCPD too much and profiling black males. Taking offense to such an allegation, Ms. Hubbard wished to file a complaint against him. However, when she attempted to file a complaint with the police department, she was notified that she needed to file the complaint with OIE. After filing the complaint with OIE, nothing was done in violation of HCC policy. Ms. Hubbard was made aware that after filing her complaint with OIE, the OIE investigator assigned to handle the matter had lunch with Captain Boxie and she was later informed

that they were in fact good friends. This is just a glimpse of how HCC's policies are selectively enforced or rather, not enforced for Black individuals at the campus. Although Ms. Hubbard had a valid complaint she wished to file against a member of the HCCPD, since Captain Boxie was an individual with some amount of clout at the college, HCC effectively stonewalled Ms. Hubbard from moving forward with a complaint by giving her the run around and not actively following HCC written procedure. Such treatment is not seen amongst the other white and Hispanic employees of the college. Rather, Black individuals' complaints are regularly treated with less haste, more skepticism, or no action at all. Since attempting to lodge her complaint, Ms. Hubbard has faced retaliation. Captain Boxie in turn filed a complaint of his own against Ms. Hubbard which mischaracterized her as an unprofessional, stereotypical angry, black female who interferes with the police activity. All of these allegations are untrue. Her initial complaint involved a perceived lack of police presence around the campus and in the library. Since making her complaint, she has noticed even less of a police presence in the area of the school that she works.

100. Rodney Jackson - Race discrimination: Wrongful termination - Mr. Jackson began his employment at HCC as Manager of Financial Aid Services. Mr. Jackson had years of success at HCC until the arrival of Chancellor Maldonado. After Maldonado's arrival, Mr. Jackson noticed that many of his other black co-workers were being replaced in favor of white and Hispanic employees. Shockingly, Mr. Jackson was made aware that his Hispanic supervisor, Teri Zamora, said that he too needed to go. Following this, one of his employees went to HR to file a grievance complaint against him because she did not get a position she thought she was getting (Social Media Coordinator). HR referred the employee to the OIE's office to file her grievance with that office. Employee filed a false Title IX "Sexual Harassment" compliant against Mr. Jackson alleging he made unwanted sexual favors/advancements to her. He was called in by EEO/OIE's office to

explain his side of the story. After his interview with the investigators, he was placed on paid administrative leave until the OIE's office completed its investigation and was ultimately informed that he was terminated for violating company policy-- "Standards of Conduct", DDA, Equal Employment Opportunity.  The claim was meritless, and the investigator failed to interview all witnesses. Mr. Jackson noted that Ms. Zamora and the OIE investigative team treated him as guilty until proven innocent in violation of HCC policy. Mr. Jackson performed his duties with excellence and served as co-chair of the department. Mr. Jackson's statement was not given the same weight as the White female's statement, given HCC's Displacement Plan's agenda of replacing Black individuals.  Rather, as with other black employees at HCC, Mr. Jackson was attacked with trumped up allegations in order to support his termination so he could be eventually be replaced with a different white or Hispanic employee.  The investigation process was a disguised charade with its ultimate goal being to pad Mr. Jackson's file and ripen him for termination, which ultimately is what happened.

101.    Vernita Jackson - Race discrimination: Pay Disparity/Promotion/Workload Disparity/Advancement Denied/ Denied employment opportunities. Ms. Jackson worked as an adjunct professor at HCC from 2010-2019. After Covid-19, other white and Hispanic adjunct professors were called to return to work, but Ms. Jackson and several other black adjuncts were specifically not called.   Despite being as qualified and having as much experience as the other white and Hispanic adjuncts, Ms. Jackson was not given the opportunity to return despite their being open positions available.  Instead, HCC brought in new Hispanic and white individuals to teach classes. Ms. Jackson applied for many jobs in her department and throughout HCC but was not granted an interview though she has the education and experience for the jobs to which she is applying and has previously served in similar position at HCC.  These positions were then filled

with other less qualified and less experienced White or Hispanic applicants as compared to Ms. Jackson. When Ms. Jackson pressed an HCC representative for information as to why her adjunct contract was initially not renewed, she was informed that due to Covid, there were no more funds to honor her contract. Despite this bogus claim, HCC continued to make job postings for potential adjunct professors throughout the Covid pandemic and hired various adjunct professors, predominantly white and Hispanic candidates. Ms. Jackson was shocked to have received such a false claim from HCC and realized that she had become another victim in the transformation plan.

102. China Jenkins - Race discrimination: Denied promotion/Pay disparity - Ms. Jenkins worked at HCC for two years as Manager of Faculty and Instructional Leadership Development Services. Due to her success she was given responsibilities that exceeded the scope of her employment. Though she carried the duties of a director, she was titled and paid as a lesser-level manager despite the fact that other Hispanic and white individuals at HCC were afforded the director title and benefits when assigned to such a position. Her counterparts at many of the other Texas colleges were directors and were paid accordingly. She requested a job analysis to evaluate her position and salary and was denied by HCC in violation of HCC written policy. Her salary was $15,000 below several of the white and Hispanic employees that she actually supervised, despite the fact that she was their supervisor, and had better qualifications and experience. Ms. Jenkins often observed the disparity in promotions for Black employees as opposed to Hispanic employees. Marica Olivera (a Hispanic female) harassed and bullied other employees and was promoted to Coordinator for Dr. Perez. Disgusted by the treatment that she faced, and she witnessed other black employees being subjected to at the hands of white and Hispanic supervisors, Ms. Jenkins accepted a position elsewhere and left the college due to its discriminatory practices.

103. Michelle Johnson - Race discrimination: Harassment/Retaliation/Denied

promotion - Michelle Johnson is a 7-year employee of HCC as an adjunct professor and program director. While working as a grant director, she withstood harassment and retaliation from Dr. Catherine O'Brien (White female) when she did not cooperate with unlawful and improper requests for grant funds to be spent outside the grant's scope. Interestingly, Dr. O'Brien would request that Dr. Johnson be the one that handle these improper grant requests as opposed to other white and Hispanic grant directors. Again, this is a common theme at HCC, white and Hispanic supervisors would request their black subordinates commit acts that were either violative of ethics or laws, and then retaliate against them once they refused.  Because she refused to break the law for her white supervisor, she was retaliated against.  Specifically, the ICIA grant was awarded to Raul Yzaguirre School of Success (RYSS), a private charter school in which Dr. Adriana Tamez is the Superintendent. This relationship was thought to be illegal since Tamez was also a current board member. On several occasions, Dr. Johnson would inform Dr. O'Brien of her constant concerns regarding the misapplication of grant funds. She even met with HCC Grant Office to verify what was allowed and unallowable under this specific grant. It was often too many times the Principal was requesting unallowables which caused such dissention amongst all of us. Subsequently, Dr. Norma Perez, Vice Chancellor of Instructional Services (VCIS) requested a meeting because the situation was overwhelmingly out of control with RYSS staff requests masked by Dr. Tamez. Due to this fact, the grant had constant modifications to appease Dr. Tamez and RYSS staff.  Because Dr. Johnson refused to "go along" with Dr. Obrien's demands, she was denied advancement and given unequal shares of workload as compared to her white and Hispanic co-workers.  The stress of dealing with a demanding, high-profile grant recipient position eventually caused Dr. Johnson to suffer temporary paralysis. Dr. O'Brien then used this opportunity to reassign Dr. Johnson's duties to another white male while she was in the hospital and suggested Dr. Johnson apply for

another job within the department.  Essentially, Dr. Johnson was informally removed from her position by Dr. O'Brien. After the grant concluded, Dr. O'Brien adamantly refused to communicate with Dr. Johnson whereas she would regularly communicate with other Hispanic and white grant directors. Dr. Johnson applied for several HCC positions but never received an interview despite her clear qualifications and educational background.   These positions predominantly went to less qualified and less experienced white and Hispanic individuals.  Upon Dr. Johnson's departure from HCC, she was required to return some items to the main building. When she got to lobby, the attendant called O'Brien and O'Brien denied her entry and instructed her to leave the items outside. Dr. Johnson was left to feel like some sort of pariah. Dr. Johnson even tried to talk to her immediate boss, Samuel West and his secretary. The secretary came off the elevator and when Dr. Johnson approached her, the secretary screamed "Dr. O'Brien said not to talk to you." Such petty and improper instructions were never given by Dr. O'Brien employees when dealing with other white and Hispanic employees and are just further details of the discriminatory behavior Black HCC employees are faced with on a daily basis.

104.    Andrea Jones  - Race discrimination: Unequal application of HCC policy/Denied promotion and advancement - Ms. Jones was forced to resign due to the hostile working conditions under her supervisor Mary Lemburg, a White female. Ms. Jones endured numerous incidents, encounters, comments, and treatment that were either racially motivated or in retaliation for not breaking HCC policy at Ms. Lemburg's request. Ms. Lemburg would instruct Dana Fields to tell Ms. Jones that overtime was not allowed, and she must remove it from her timesheet. However, white and Hispanic her peers had not received the same instruction regarding their overtime. Ms. Lemburg asked Ms. Jones to use her coworkers' notary seals when they were out of the office and retaliated against her when she refused to do so. Again, this is a common theme at HCC, white and

Hispanic supervisors would request their black subordinates commit acts that were either violative of ethics or laws, and then retaliate against them once they refused.  Ms. Jones also knew of managers doctoring enrollment and graduation numbers under Ms. Lemburg's direction. After years of enduring retaliation, including denial of FMLA, Ms. Lemburg was successful in forcing Ms. Jones to resign and retire in May 2019. Ms. Jones would have worked longer, and earned more retirement benefits, but for Lemburg's discriminatory actions.   Ms. Lemburg would make comments such as: "you should be happy you even have a job" and other comments that Ms. Jones perceived as being racially motivated. After resigning in 2019, the Chancellor's secretary came to her and said: "why did you let them win." Ms. Jones never discussed or mentioned anything that she had been experienced with her, and was surprised to hear how clearly aware others, including the Chancellor's officer, were of how Ms. Jones was being treated.

105.    Shalandria    Jones   -   Race    discrimination:    Pay    Disparity/Promotion Denied/Workload Disparity/Advancement Denied/Forced Resignation.   Ms. Jones worked in HCC's financial department. Dean Indra Palaez, a Hispanic female, hired Armando Galvan Cruces, a Hispanic male, to replace a coworker in the financial department. While working at both the West and Coleman campuses as a Financial Coach, Ms. Jones became aware that the SE campus had an opening for a Financial Coach position.   After applying and interviewing, and despite having better experience and qualifications, Ms. Jones learned that the position was given to Armando Cruces, a Hispanic male.  Ms. Jones was shocked by the hiring committee during her interview.  The primarily Hispanic committee asked no questions. Marlene London was the only one who asked questions. Ms. Jones felt the rest of the panel had already made up their minds. Shortly after, Ms. Jones learned that the position was given to Armando Cruces.  Mr. Cruces' did not have a banking background, which was a basic requirement for the job. Conversely, Ms. Jones

had experience as a Financial Coach at both West and Coleman colleges, a master's degree, and the banking industry background required for the position.    Despite being qualified for the position, it was awarded to an unqualified Hispanic applicant. After she was overlooked for the role, Ms. Jones was ultimately forced to resign as she was no longer able to advance at HCC.  This again, is a common theme at HCC.  Qualified black applicants are routinely overlooked in favor of less qualified white and Hispanic applicants.  Eventually, they are forced to leave the school in order to attain the position and compensation they rightfully deserve.

106.    Stephanie    Jones    —    Race    discrimination:    Pay    disparity/Denied promotion/advancement - Stephanie Jones has worked at HCC for 24 years in Communications and as a Senior Systems Analyst. Joe Conway (White male) promised Ms. Jones a managerial role when he took over the department, but the promotion never materialized. Rather, Ms. Jones was used to train other non-black individuals that would ultimately be given the positions she was told that she was being placed in.  She was assigned responsibilities in the content management system (CMS) which was a new system and was given no training. When she messed up a process, she was reprimanded even though she had been untrained on the system by her manager. She had to teach myself and learn by trial and error.  Nevertheless, she began training others in Terminal Four (T4), the Web Content Application which now became one of her responsibilities. Joe had Andrew, an Asian part-timer who was employed as a system admin.  Andrew would sit in her training sessions as an observer.  After a few weeks of training, she heard Joe tell Andrew who was about to apply for a full-time position as a web specialist to add on his resume, that he was a trainer which he had never trained anyone for his resume and his application. Andrew did not implement the training he only sat in as an observer. After Andrew got the job, Joe stopped Ms. Jones from training and proceeded to make Andrew the trainer, but Andrew asked her to do the training

because he was never interested in training. This was all a part of Joe's plan to push Andrew in a lead role and prevent Ms. Jones from advancing in the department. Andrew was then given the job of web content specialist. Despite being the more qualified and experienced for the position, and even training the individual that was awarded the position, Ms. Jones was denied a promotion in favor of a less experienced, less qualified non-black employee.  Later, Ms. Jones was given job responsibilities outside of the scope of employment.  When she complained to her manager, he told her to figure it out or face the consequences.  She was not provided with any additional compensation or benefits for the extra duties even though other white and Hispanic employees who were working outside of their scope were regularly given stipends or additional benefits.  Joe Conway called Ms. Jones in to meet with him and Linda. Shortly into the meeting Linda began to echo things from Joe regarding constant mistakes that he had harassed Ms. Jones about on an on-going basis relating to her perceived deficiencies in the tasks outside of her scope of employment. It became apparent to Ms. Jones that he was plotting with Linda to move against her with some performance issues. Linda Toyota began to tell Ms. Jones that the Chancellor was on to her about errors that Ms. Jones had made in her work. When Ms. Jones responded that she had been given these tasks of writing by Joe, but writing did not have anything to do with her Job Description, she was ignored.  To add insult to injury, Linda Toyota denied additional training for Ms. Jones in her new capacity, while non-Black employees were regularly allowed to receive training to succeed and advance in new positions.  Rather, Ms. Jones was being selectively targeted in order to pad her employee file as an insubordinate and ineffective employee even though HCC was the culprit in failing to provide her with the resources to effectively complete her duties.  Ms. Jones was being setup to fail.

107.    Elamees Kelly-Molo - Race discrimination: Denied promotion/advancement -

Elamees Kelly- Molo worked as adjunct Faculty at HCC from 1992 – 2020. She has applied for numerous positions at HCC. Instead of hiring her, HCC has hired other less qualified Hispanics and Whites despite the fact that Ms. Kelly-Molo had better experience and qualifications as compared to the ultimate employee. She applied for a full-time sociology faculty position, but HCC hired a White female for that job that was less qualified and less experienced than Ms. Kelly-Molo. In her position as adjunct, one of the white students went to the dean because she was given a C (she actually should have received a D or F). Ms. Kelly-Molo was asked about changing the grade and informed the dean that she would change to D or F before bumping the grade up. The Dean (Dr. Dulan) told her that she should be sensitive to the student and change the grade. Ms. Kelly-Molo then asked if the student was black would the consideration be the same. After this comment, Ms. Kelly-Molo noticed things shift in her department and this is when her trouble of gaining full-time employment really began.  Ms. Kelly-Molo noted that HCC requires black professors to acquiesce to their Dean's and supervisors demands or face retaliation or other adverse employment action.  However, the white and Hispanic professors are given more freedom and discretion in how they handle their business and are not given as much oversight as the black professors.  Eventually, she was not awarded another adjunct teaching position due to HCC's claims that Covid had eliminated her position.  Despite this bogus claim, HCC continued to make job postings for potential adjunct professors throughout the Covid pandemic and hired various adjunct professors, predominantly white and Hispanic candidates.

108.    Elfreda King - Race/Age discrimination – Ms. King's HCC manager refused to provide her with necessary training needed to be successful in her job despite affording those consideration to other white and Hispanic employees. Her non-black manager created a hostile work environment, raised her voice numerous times, made fun of and laughed at Ms. King when

addressing other employees, and abused her power and authority over Ms. King.  Ms. King was the only individual in her department that received such behavior from her manager.  The other white and Hispanic individuals were not subjected to such treatment. Ms. King experienced retaliation for turning in her coworker to HR and for bringing up some improprieties that she discovered in HCC's financials to her supervisor.  The project consisted of cleaning up the assets that HCC owned. When she started researching, she found out it was a mess, so she ended up just working on the building's category, cleaning up over $32 million dollars that have been misstated in their financials. HCC was very passive and in their communication to the auditors (Grant Thornton) they mentioned that some cleanup work was done, and they waited for the Auditors to ask more questions about it. HCC had been written up the previous year and in a write-up like that it causes the audit firm to be reprimanded so HCC didn't want to trigger another incident with them. So, the way it was handled it was kind of downplayed so that the Auditors would not be written up for not catching these items.  HCC decided that it would adjust the books and not have the effect of it roll up through the fund balance. The Accounting Department had the IT Group zeroed out the dollar amounts.  If it ran up through fund balance that would be a bad thing for HCC because they would have to explain that. The building's category was the only category Ms. King made adjustments in. As she reviewed the other categories she came up with a lot of different problems and HCC decided not to correct any other problems. One of the problems that she ran into was really big in the Furniture and Equipment category. There were no checks and balances and it was an easy area where merchandise could be stolen.  When Ms. King addressed these concerns with her supervisor, she was told not to worry about it and to do her job.  Shortly thereafter she terminated from her employment.  This is another all too familiar tactic at HCC, if Black individuals happen to stumble upon any impropriety that may be occurring at HCC, they are

Page **45** of **76**

quickly terminated or released from their employment under false pretense.

109.   Doris Lacey - Race discrimination: Pay Disparity/Promotion Denied/Workload Disparity/Advancement Denied. Ms. Lacey is an Instructional Support Specialist at HCC.  Ms. Lacey's department head hired a young Hispanic female to work in their department.  Though Ms. Lacey and the young Hispanic held the same position and Ms. Lacey was more experienced, Ms. Lacey was moved from her desk to a desk in the basement and the young Hispanic was given Ms. Lacey's desk despite Ms. Lacey's seniority.  Ms. Lacey also endured several other events in which Hispanic employees were given preferential treatment over her. Specifically, she was not afforded the opportunity to virtually audit tests and complete other remote work even though other white and Hispanic individuals in her department were given these opportunities.  Eventually, Ms. Lacey was moved completely out of the department to another department where she was replaced by a less qualified and less experienced Hispanic female.  Since, Ms. Lacey has applied for other positions in departments in which she'd previously worked successfully but despite her qualifications for the positions, and the fact that she has worked in those departments before, they are routinely given to other less qualified or less experienced white and/or Hispanic candidates. Ms. Lacey was also paid less than her white and Hispanic counterparts even though she held comparable or advanced experience and qualifications.

110.   Kimberly Mason - Race discrimination: Pay disparity/Denied promotion and advancement/False and unwarranted disciplinary actions. Ms. Mason is an officer with the HCC police department. Her pay is less than White and Hispanic officers with comparable or less tenure. Specifically, Hispanic Male officer Tobar Hispanic female Montiel starting off at 60/61k whereas Mason started off at 52k despite similar qualifications, experience, and education.  Within the department, there are no verifiable guidelines on how to obtain a pay increase. Captain Martinez

(Hispanic) and HR members set the salaries and continued to pay Black officers less than their White and Hispanic coworkers of similar tenure and experience. The pay disparity became more evident when HCC implemented its Displacement Plan and changed the pay scales. Black officers with many years of service and experience earned less than White and Hispanic officers. Black officers are disciplined more harshly for the same or similar policy violations as White and Hispanic officer. For example, Captain Martinez falsified TCOLE records so that other Hispanic officers could get promotions and pay increases. He was allowed to stay on at the department for months before the department suspended him. Previously, the department fired a former Black police officer for manipulating time and attempted to file criminal charges against him but took no such actions against Captain Martinez for his falsification of TCOLE records. Other HCC PD supervisors instruct supervisors to give purposefully poor evaluations for black officers so they can use that as justification to prevent pay increases. Officer Mason has also been placed on bogus performance improvement plans. At one point, she received a good performance review from her black supervisor, but then it was allegedly augmented and changed by her supervisors to reflect a negative evaluation and that she was now being placed on a performance improvement plan. When Officer Mason requested her superior to explain why she was being placed on such a plan, he was unable to provide her with a response. The unchecked discrimination has now created an atmosphere in the department where white and Hispanic officers and supervisors are comfortable making blatantly racial remarks and using egregious racial slurs when speaking to or about Black officers, one such occurrence happening with Officer Mason when a white officer openly used a racial slur in front of her. When she reported him for this language, Officer Mason began to face more retaliation. During roll call the officers were yelled at by the Sergeant who used the slur telling all officers that there was no need to go to Human Resources for complaints about him.

Rather, they would be rejected and sent back to "us" for in-house investigations. He also stated that the officers were a bunch of cowards for always "bitching" and not being woman or man enough to come to him directly. Officer Mason has recently been placed on administrative leave and is being threatened with termination after her and another Black officer's body cam footage was selectively monitored in order to locate any departmental transgressions. Such monitoring seems to target black officers at a higher rate as compared to the monitoring of White and Hispanic officers. Officer Mason also reported that her, and other black officers body cameras seemed to frequently activate on their own volition without being manually turned on. It is believed by Officer Mason and other Black officers that this is yet another way that her supervisors can attempt to monitor Black officers in attempts to find purported violations and ripen them for termination. She has since been placed on administrative leave and is facing termination for the use of certain language. However, other white and Hispanic officers have used similar language at HCC and have not been terminated or suffered any adverse employment action. Officer Mason was informed that her participation in this present lawsuit would result in problems for the officers, including termination, and it seems that is now coming to fruition.

111. Debra McGaughey - Race Discrimination: Casualty of Transformation/ Harassment/Retaliation/ Pay Disparity/Promotion/Demotion/Workload Disparity/Advancement Denied. Ms. McGaughey is the Director of Communication Services at HCC's Central Campuses. Despite her clear qualifications and experience, Ms. McGaughey has been unable to advance at HCC. While working on a communications project between HCC and Houston Metro, Ms. McGaughey voiced her concerns about some of the marketing aspects of the project, concerns which were eventually elevated to Chancellor Maldonado. Chancellor Maldonado approached Ms. McGaughey and said he

heard about her concerns and asked why she was debating the design of a project with Metro's staff. After she voiced her concerns about the project and what she would like to do to rectify the issues, the Chancellor informed her that was not her place and that he would handle the situation. Soon after, the Chancellor proceeded with his transformation plan, where, among a host of other organizational changes, all the college communication directors, including Ms. McGaughey would stop reporting to college presidents and start reporting to the centralized district communications office.  Since this exchange, Ms. McGaughey has applied numerous times for the Associate Vice Chancellor of Communications and Marketing position. Despite being qualified for the position and generally regarded as excellent by her supervisor, she was unable to attain even an interview for the position. The eventual non-Black AVC hire had less supervisory and management experience, less marketing experience, and no media or higher-educational experience at all. Coincidentally, the new hire had served on the hiring committee that recommended Dr. Cesar Maldonado as HCC's new chancellor in 2014. Despite her lack of strategic marketing or directly relatable experience, the new hire was named AVC. Her tenure as the AVC of Communication and Marketing was punctuated by high employee turnover, low staff morale, lack of communication and overall department volatility. She was eventually dismissed after a year and eight months when it became clear she was not up to the task. When the position was reposted in 2018, again Ms. McGaughey was not considered for the position despite her qualifications and experience with the position.  The position was again awarded to a less qualified individual.

112.    Lue Mims - Race Discrimination— Ms. Mims was advised she was not qualified for the position she is currently performing after she made complaints regarding some of HCC's

policies. The change to her employment was supposed only to be a title change, not a duty change, but she found herself having a far more reduced role. Ms. Mims has been with HCC since 2014. Her managerial duties were taken away and she was replaced by a younger, unqualified individual despite the fact that Ms. Mims was ably performing the position. Ms. Mims has conducted her duties faithfully and diligently; nevertheless, she faces continual harassment and retaliation in order to force her to resign or face inevitable termination. The retaliation started when Ms. Mims took several cases to compliance. Several were out of compliance – one such program was the apprenticeship; the teachers teaching in the name of HCC were not properly credentialed.  When Ms. Mims tried to address these issues with her supervisor, she was taken out of the loop and had her managerial duties removed and given to other white and Hispanic employees.  One of the concerns of the director is that they did not want them going through HR because a lot of the white and Hispanic teachers would not pass qualification and background checks. In another case – Alix Alvarado, a Hispanic HR employee, knew teachers were not credentialed. Her subordinate took the class and her certificate was not accepted by the state b/c the instructor was not credentialed. Instructors were being paid to credential.  Johnny Sexton then started giving more of Ms. Mims work to a Hispanic female to do. Ms. Mims remains in constant fear of being unjustly harassed until she is terminated, similar to the conduct to which other Black individuals have been subjected. Ms. Mims has witnessed the advancement of unqualified Hispanics to management and leadership levels, where they have created hostile work environment, particularly towards herself and other Black individuals.  Because Ms. Mims chose to do her job correctly which in turn upset the apple cart and potentially lead to the disqualification of improperly placed white and Hispanic instructors, Ms. Mims was then faced with retaliation and a reduction in responsibility. When other Hispanic and white employees at HCC do their jobs capably, they are rewarded and promoted, but

when Black employees such as Ms. Mims do what they are hired to do, they face scrutiny and have their responsibilities taken away from them.  Ms. Mims has since filed several applications for different positions within HCC.  Despite being a veteran, and more than qualified for some of the positions, they have instead been awarded to less qualified white and Hispanic individuals.  Ms. Mims would also witness her Hispanic supervisor artificially inflate the score of Hispanic applicants in order to provide them with the position, even though their scores were much lower.  Ms. Mims also was paid less than her white and Hispanic co-workers with similar experience and education.

113.    Krishna Morancie - Race Discrimination: Pay Reduction/Wrongful Termination— Ms. Morancie worked at HCC as an Enrollment Specialist. She was wrongfully terminated when a Hispanic coworker falsely alleged that she was not completing the assignments tasked to her. The Hispanic individual would assign work to Ms. Morancie and not inform Ms. Morancie of the task.  This was an effort to create an illusion that Ms. Morancie was not completing her work in order to ripen her for termination. Another instance occurred where Ms. Morancie informed her supervisor that she was unable to complete a tasked assignment because she did not have the proper technological setup to complete the task.  In response, the Hispanic individual ignored Ms. Morancie, provided her additional work in which she knew Ms. Morancie was not technologically able to complete, and then alleged that Ms. Morancie was failing to timely complete her work. This allegation was false, but her supervisors did not conduct a reasonable investigation of the allegations and terminated her employment.  Due to her Hispanic coworker's false allegations, and the incompetence of her supervisors in failing to conduct a thorough investigation, Ms. Morancie was fired because HCC listened to a Hispanic voice over that of a Black voice and failed to follow proper HCC policy and procedure relating to the grievance process. Ms. Morancie's supervisor

presumed the validity of the allegations by a Hispanic worker who alleged false and unsubstantiated allegations of failure to complete an assignment. The institution failed to provide and/or follow the employee handbook that describes provisions of work and termination. The Hispanic individual that lodged the complaint against Ms. Morancie was ultimately the same individual that replaced Ms. Morancie once she was terminated. After Ms. Morancie's termination, she filed a complaint with her immediate supervisor, and she was never given a response, let alone the opportunity to clear her name in violation of HCC policy. Ms. Morancie's termination adversely affected her ability to obtain employment, and the stigma follows her to other places of employment.

114. Mary Page - Race Discrimination: Forced Retirement— Ms. Page became a witness and victim of the "transformation program" instituted at HCC when the counseling department became the focus of that "program." Greater than 50% of the counselors at HCC were black counselors so this reduction disproportionately affected black employees as compared to white and Hispanic employees. Most of the white and Hispanic replacements brought into the department after Maldonado's arrival did not have degrees in counseling, even though it should have been a requirement for the position. When faced with the challenge of reapplying for a position she had successfully held for more than three (3) years, she elected to retire. She chose to retire because it became unbearable to stay any longer at HCC and suffer the discrimination and harassment she and other Black colleagues were facing on a daily basis. Specifically, she and other Black individuals were constantly denied the opportunity to interview for or be selected to fill positions that eventually went to less qualified Hispanic individuals—candidates which either had no experience, less education, and/or fewer years of service in the positions for which they were applying than Black applicants such as Ms. Page. More concerning, Ms. Page witnessed some of

these Hispanic individuals not being interviewed by the selection committee pursuant to HCC policy, but rather these individuals would preferentially meet with HCC leadership behind closed doors, and then be directly placed into a position, circumventing the HCC hiring policy. These practices made it virtually impossible for Ms. Page to be selected for any of these positions, as the HCC hiring policy was not followed, and the Hispanic applicants were given preferential treatment.

115.    Ruth Parham - Race discrimination: Pay Disparity/Promotion/Demotion/Workload Disparity/Advancement Denied. Ms. Parham was a Counselor at HCC that was eventually forced into retirement. After the arrival of Chancellor Maldonado, HCC moved counselors from the faculty pay scale to a lower pay scale which caused Ms. Parham to lose thousands of dollars of income. The college also began hiring several white and Hispanic individuals to replace long tenured black counselors. Greater than 50% of the demoted counselors at HCC were black counselors so this reduction disproportionately affected black employees as compared to white and Hispanic employees. Most of the white and Hispanic replacements brought into the department after Maldonado's arrival did not have degrees in counseling, even though it should have been a requirement for the position. Ms. Parham quickly saw her position change from Counselor, to Sr. Advisor, to Advisor after the arrival of Maldonado whereas Hispanic individuals with less experience and educational backgrounds were preferentially placed in more senior positions. The demotion coupled with the constant harassment and discrimination due to her race and age from her supervisor, Jeff Andre, a white male, left Ms. Parham feeling defeated. She wrote letters and went to HR about Mr. Andre to no effect. Ms. Parham was constructively discharged because she was humiliated and forced to resign to avoid losing retirement income with each demotion and pay reduction. These positions were later filled with predominantly white and Hispanic applicants.

116. Beverly Perry - Race Discrimination—Dr. Perry experienced years of mistreatment, insults, and was demoted from the Biology Chair, and was passed over for promotions in favor of white and Hispanic applicants even though she was the most qualified for the position. Despite being a thirty-year employee, after the arrival of a new white male dean, Ms. Perry was forced out of her position as the Biology Chair and replaced with a non-black employee. During her tenure, she also received a smaller salary as compared to her Hispanic and White co-workers despite her educational background, experience, and qualifications. Dean Dr. Tom Loesch, a white male, caused all the changes in Perry's position and was a constant source of her harassment and discrimination. Dr. Loesch even went so far has having IT transfer Perry's email account moved to a separate server so that he would have the ability to check her emails and erase them when she complained about his treatment of her to other individuals. Other Hispanics and Whites were never treated so disrespectfully by Dr. Loesch. She was also denied ADA and FMLA accommodations by HCC in violation of their written policy and her proof of medical need. Other white and Hispanic individuals in her department were afforded ADA and FMLA accommodations, but to force Ms. Perry out of her position, these accommodations were denied by Dr. Loesch.

117. Fredrick Portis - Race discrimination: Pay disparity/Denied promotion and advancement/False and unwarranted disciplinary actions. Fredrick Portis was a corporal in HCC's Police Department. He began with HCC's police department in 2014. His pay was less than White and Hispanic officers with comparable or less tenure despite his years of service and qualifications. Within the department, there are no verifiable guidelines on how to obtain a pay increase. Captain Martinez (Hispanic) and HR members set the salaries and continued to pay Black officers less than their White and Hispanic coworkers of similar tenure and experience. The pay disparity became

more evident when HCC implemented its Displacement Plan and changed the pay scales. Black officers with many years of service and experience earned less than White and Hispanic officers. Black officers are disciplined more harshly for the same or similar policy violations as White and Hispanic officer. For example, Captain Martinez falsified TCOLE records so that other Hispanic officers could get promotions and pay increases. He was allowed to stay on at the department for months before the department suspended him. Previously, the department fired a former Black police officer for manipulating time and attempted to file criminal charges against him but took no such actions against Captain Martinez for his falsification of TCOLE records. Other HCC PD supervisors instruct supervisors to give purposefully poor evaluations for black officers so they can use that as justification to prevent pay increases. Officer Portis has been retaliated against and harassed by Captain Martinez, Chief Cunningham and Captain Boxie. Any request made by Officer Portis to investigate such retaliation was met with silence. Officer Portis has specifically been asked by his superiors to fail certain non-Hispanic officers in certain certifications, such as handcuff certification, even though they had passed that discipline. Officer Portis was not asked to fail White or Hispanic officers. When he refused to fail these certain officers, Portis noticed that he was then subjected to poor performance reviews and had his employment file padded. Officer Portis also provided an affidavit in another matter against HCC where he addressed his investigation into claims surrounding a situation with Chancellor Maldonado. Following his investigation into claims involving the Chancellor, Officer Portis noticed that he was being further harassed and retaliated against by his superiors. Body camera footage from the event in question interestingly disappeared and became inaccessible. Following his investigation, despite good performance, Officer Portis was again given substandard ratings by his superior officers. When pressed as to why he was given these poor ratings and what he could do to rectify the situation,

Officer Portis was met with silence as there was no rationale justification that any of his superiors could provide.  Rather, these substandard ratings were pretextual, and an effort to tarnish his otherwise good reputation and ripen him for termination. He was further micro-managed which made it eventually impossible to effectively do his job.  He had duties removed and assigned to other officers and found that he was no longer able to advance within the department.  Rather, despite his years of service and qualifications, positions were being given to less qualified Hispanic and white individuals with less experience. Ultimately, Officer Portis and the other PD officers were informed that their participation in this present lawsuit would result in problems for the officers, including termination.

118.  Reynaldo  Pradia  -  Race  discrimination:  Casualty  of Transformation/Harassment/Reduce salary/Income loss/Denied opportunity to retain to current work status. Mr. Pradia worked at HCC for 17 ½ years in HCC's construction department.  He held the title of Executive Director of Construction and Project Management until his transformation and effective termination.  Mr. Pradia filed a Formal Complaint against his direct supervisor, Chuck D. Smith, a white male. Mr. Pradia filed the complaint on behalf of himself and his staff alleging claims of abuse, harassment, age discrimination, retaliation, threatening and demeaning comments, vulgar language & a hostile environment.    Mr. Smith was put on administrative leave for his actions and was later terminated after a separate incident involving sexual discrimination. Up until Mr. Smith's termination, Mr. Pradia suffered from constant discrimination under Mr. Smith who would manufacture false emails about Mr. Pradia in an attempt to get him fired.  Despite Mr. Pradia's repeated complaints, Mr. Smith was left unchecked for years and HCC permitted him to spew his abusive and retaliatory language and create a hostile environment.  After Mr. Smith was let go, the Chancellor brought in a new CFO from Memorial

Hermann Hospital, Marshall Heins, another white male, to take Chuck Smith's place, despite the fact that Mr. Pradia was more than qualified for the position. Shortly thereafter, Mr. Pradia received a Memorandum from the Chief Facilities Officer & Janet May, the Chief Human Resources Officer, informing Mr. Pradia that there would be a transformation of the Construction & Facilities Department and that HCC claimed his position was now redundant. He was later terminated from his position. After Mr. Pradia was let go, he was made aware that Marshall Heins had brought in and hired a number of employees, predominantly white and Hispanic, he used to work with at Memorial Herman to fill the position vacated by Mr. Pradia thus negating the claim by HCC that the position was no longer needed.

119. Erica Rhone - Race Discrimination: Bullying/Harassment/Pay Disparity— Ms. Rhone moved into the Financial Aid Department because her previous department was dismantled. She has had issues with Joellen Saucier (white female; Executive Director of Financial Aid), who has bullied and verbally abused her, at one point even coming as close to being physically intimidated by Ms. Saucier. Ms. Rhone filed grievances against Ms. Saucier, and nothing was done in violation of HCC policy. Ms. Saucier would accuse Ms. Rhone of giving her dirty looks and then use that opportunity to yell and scream at Ms. Rhone to the point of tears. Ms. Saucier did not accost other White and Hispanic employees in the department in this manner. Rather, Ms. Rhone was constantly singled out and isolated. She was left out of dinners, birthday celebrations, a and other events at Ms. Saucier's urging. When Ms. Rhone informed Ms. Saucier that she felt uncomfortable meeting with her one on one due to Ms. Saucier's verbal abuse, Ms. Saucier then forwarded that e-mail to HR and claimed that Ms. Rhone was refusing to meet her job responsibilities in an attempt to pad her file and ripen her for termination. When Ms. Rhone asked to be moved out of the department, and Karen Hutchins, a white female, would not move her from

the department whereas when other white and Hispanic employees have issues with co-workers, steps are taken to ensure they can be moved to a new work environment, or additional training and observation is provided to ensure the issues are addressed. Rather, Ms. Rhone was forced to return to the constant torment on a daily basis. Several employees even went so far as to tell Ms. Rhone that Ms. Saucier informed them that she did not like Ms. Rhone and that she needed to watch her back, Ms. Rhone filed grievances with HCC's HR and EEO departments when nothing was done. She told HR that she felt harassed and threatened. However, as Janet May and Joellen are personal friends, nothing was done about the situation in violation of HCC policy. To add insult to injury, Ms. Rhone has a master's degree, but non-Black new hires with less education and qualifications earn more than she earns under Ms. Saucier.

120. Carrie Robinson - Race Discrimination: Harassment/Bullying– Ms. Robinson worked at HCC in various positions from 1999 until she was wrongfully terminated in October of 2016. In 2014, she started working for Vicki May, a white female, in the Division Chair of Emergency Medical Services department as the Divisional Secretary. When Ms. Robinson first started working for Ms. May, she had to scramble to clock in because Ms. May or someone under Ms. May would be working on Ms. Robinson's designated computer. HCCS had a policy that employees could only log into their respective work areas, but Ms. May did not adhere to this rule. Ms. May would also make racial statements around Ms. Robinson, such as "she had some flogging to do upstairs" regarding students she claimed she needed to get in shape and that she has to "practice tying her nooses." Ms. Robinson became pregnant in 2016 and, per her Doctor's orders, required some minor accommodations in order to safeguard the pregnancy and her child's health. Ms. May disregarded the medical directive. Rather, she had Ms. Robinson work in a dusty storage room and asked her to carry out physical tasks against her doctor's orders. Ms. May told Ms.

Robinson that "it's not going to kill you or the baby." Later in that year, Ms. Robinson submitted a leave request to attend her Aunt's funeral. However, Ms. May tried to block the request. According to HCCS' policy, Ms. Robinson would be allowed to attend the funeral as long as it is an immediate family member. Nonetheless, Ms. May threatened to fire Ms. Robinson if she left. The following month, Ms. Robinson's doctor filed her FMLA papers in July 2016 so that Ms. Robinson could remain on bed rest until delivery of the baby in January 2017. While she was on Intermittent FMLA and Maternity leave, HCC filed papers to terminate her employment. They also demanded she come to work so they could fire her while at the workplace. White and Hispanic employees were not treated this way at HCC.

121. Debra Robinson - Race discrimination: Pay Disparity/Promotion/Advancement Denied. Ms. Robinson worked at HCC for over 40 years. From 2010 until her retirement in 2021, she was the Director of Auxiliary Services and Building Operations. Despite doing the work commensurate with the title of Vice President, HCC refused to provide her with a raise or a promotion even though similar accommodations were made for other white and Hispanic employees. Again, this a common tactic at HCC, require black individuals to take on additional work or responsibility, and then not provide them with the appropriate title, salary, or benefits that go with the position. When other white or Hispanic individuals are required to do this type of additional work, they are either placed into the position on an interim basis or provided a stipend to account for the extra workload. Ms. Robinson was provided with none of these things. Additionally, on another occasion she did the work of executor director but was passed over in favor of a white female who did not have the requisite experience. The white female was given the opportunity to gain the experience while learning the position although Ms. Robinson was already readily qualified and experienced. This also happened at NW College where a COO (another white

female) was given a job and given the opportunity to learn the job. Ms. Robinson had previously done the job and was never given the position despite her qualifications and experience. Ms. Robinson was forced to resign after failing to be promoted based on her experience, education, and tenure at HCC. This adversely affected her retirement as other White and Hispanic employees doing the same work earned $10-20k more than she was earning or were provided with opportunities for advancement not available to Ms. Robinson even though she was more experienced and more qualified than these individuals.

122.   Tiffany Roubleau - Race discrimination: Pay Disparity/Promotion/Advancement Denied. Tiffany Roubleau worked at HCC as a part time Registration Associate in the Admissions Office.  Throughout her tenure at HCC, she applied for full time Enrollment Assistant positions on numerous occasions.  Despite being qualified for the position, the positions were awarded to less qualified white and Hispanic employees.  She was explicitly told by the Enrollment Officer April Wiggins (who was over the Admissions Department) that if she got her associate degree, she would place her in the position. In 2014 Ms. Roubleau received her Associates from HCC and still did not get the position. The Enrollment Associate Manager by the name of Helen Britto (White/ Mexican) was determined to help another Hispanic female, Lucida, get a position full-time. She tried everything for her to get promoted, but Lucida's degree was from another country. As the years passed when Lucida did not get the position as full-time Enrollment Assistance she resigned and was later hired at the Downtown office at HCC as a full-time employee. Such effort to have Ms. Roubleau promoted to a full-time position was not provided by her Hispanic supervisor. Rather Ms. Roubleau was forced to complete the extra work without any added benefits.  By that time HCC was short on staff and Ms. Roubleau became the head Registration Assistant in terms or work and responsibility, but she was not given an actual promotion or stipend although that was

customary when taking on additional responsibility at HCC.  Such accommodations were regularly afforded to other white and Hispanic employees.  The other departments also came to Ms. Roubleau to assist them because she was so adept. Although she was dedicated to HCC and worked in the capacity of a full-time employee for years could was never awarded a full-time position. Eventually, Ms. Roubleau was forced to resign from HCC due to the accumulated stress and failure to progress at the College.  It became too painful to continue to watch her white and Hispanic co-workers be awarded full time positions despite Ms. Roubleau's experience, education, and actual participation in the full-time role.

123.    Felicia Rucker-Carter -    Race    Discrimination:    Harassment/Retaliation/Pay Disparity — Ms. Rucker-Carter has been at HCC for almost 23 years and has been in the Police Department for 13 years. Since Maldonado's onboarding, she has never received a raise in the police department despite Hispanic officers with less experience and qualifications receiving salary increases. There have been several Hispanic officers in that timeframe who were hired with fewer years of service that are making $60,000 or more a year. Ms. Rucker-Carter only makes $52,000 despite being more qualified and more experienced. At one point, she was injured working a second job. HCC PD refused to allow her to file workers' compensation. Ms. Rucker-Carter sued HCC for violating her right to file a worker's compensation claim. As a result, there was a change to the internal policy of denying workers comp for second jobs. After filing her lawsuit, she was moved back and forth between her campus and the 3100 Main building as retaliation. Her schedule was often changed, although it was understood that most officers would keep their schedules. A Hispanic Officer Vasquez was injured, and they made arrangements for her to do roll call, opportunities that were not similarly afforded to Officer Rucker-Carter.  Rather, Captains Martinez and Cunningham kicked her out of roll call and put her at the front desk. Her superiors would

refuse to allow her to make up time missed as a result of her therapy, even though this courtesy was extended to other white and Hispanic officers. When asked if she could also perform light duty, her superiors claimed there is no light duty for anyone unless you are on worker's compensation. Despite this instruction to Officer Rucker-Carter, those same superiors provided light duty options to some Hispanic and White officers. She also faced discrepancies with salary, sick time, and time off compared to other non-Black officers. Officer Rucker-Carter was one of the officers informed that their participation in this present lawsuit would result in problems for the officers, including termination.

124. Melody Dancer Samuels - Race discrimination: Pay Disparity/Promotion/Advancement Denied. Ms. Dancer Samuels has been an adjunct professor at HCC for years. Despite continuing to receive excellent student evaluations and professional evaluations from Department Chairs, she has failed to receive full time employment while other less qualified and experienced white and Hispanic employees are offered full time positions. After previously being informed Dr. Amy Tan, chair of the English department, that additional teaching qualifications would bolster her resume and chances of full time hiring, Ms. Dancer Samuels sent an email and inquired as to what the teaching qualifications were required to teach English. Dr. Tan responded that any graduate courses would suffice. Ms. Dancer Samuels took the higher-level courses and completed them. When she reapplied for the full-time position, she was informed by HCC that the courses did not meet the requirements. Dismayed by this news, Ms. Dancer Samuels asked a supervisor, Amanda Guerrero, a Hispanic female, about a possible letter of recommendation so she could attempt to attain full time employment with another university. Amanda Guerrero informed her that "they don't give out recommendations" and she will not give her a recommendation for a position outside of the university, however these accommodations are

often provided to other white and Hispanic employees.   Ms. Dancer is essentially held hostage in her position as an adjunct as HCC refuses to promote her to a full-time position despite her qualifications and refuses to recommend her for a position outside of the college, although similar courtesies are extended to white and Hispanic employees.

125.    Samoan Scott - Race discrimination: Pay disparity/Denied promotion and advancement/False and unwarranted disciplinary actions. Ms. Scott was an officer with the HCC police department. Her pay was less than White and Hispanic officers with comparable or less tenure. Within the department, there were no verifiable guidelines on how to obtain a pay increase. Captain Martinez (Hispanic) and HR members set the salaries and continued to pay Black officers less than their White and Hispanic coworkers of similar tenure and experience. The pay disparity became more evident when HCC implemented its Displacement Plan and changed the pay scales. Black officers with many years of service and experience earned less than White and Hispanic officers. Black officers are disciplined more harshly for the same or similar policy violations as White and Hispanic officer. For example, Captain Martinez falsified TCOLE records so that other Hispanic officers could get promotions and pay increases. He was allowed to stay on at the department for months before the department suspended him. Previously, the department fired a former Black police officer for manipulating time and attempted to file criminal charges against him but took no such actions against Captain Martinez for his falsification of TCOLE records. Other HCC PD supervisors instruct supervisors to give purposefully poor evaluations for black officers so they can use that as justification to prevent pay increases. Officer Scott became pregnant during her tenure as an HCC police officer.  At four months, she was visibly pregnant, yet Lt. Postell (Hispanic male) refused to allow her to work light duty.  He even sent her to oversee a possibly dangerous situation regarding an unruly student.  Officer Scott's doctor sent a letter

requesting that she be put on light duty to no avail. Her gun belt could not fit around her stomach. In the presence of other officers, Lt. Postell told Officer Scott that he did not believe women should be police officers, then said he hoped the baby did not come out deformed.  Officer Scott was reassigned to work under Lt. Postell after she returned from maternity leave. Postell said she was a problem in the department because she got light-duty, and he began to retaliate against Officer Scott.  He would do things like 1) put her on the schedule, but when she showed up to work, tell her that she was not on the schedule and accuse her of trying to steal time; 2) accuse her of not showing up for work even though she was never scheduled to work; 3) leave doors unlocked and then accuse her of leaving them unlocked; and 4) schedule her for one location then change it without letting her know before her report time so she would be late. Eventually, Lt. Postell, Chief Cunningham, and others tried to make it look like she resigned.  Officer Scott's supervisor, Lt. Postell (Hispanic male), told her not to return to work. She asked him why and he said to her that he did not want her working for HCC. When she asked if he had the actual authority to fire her, he answered that he had made up his mind, he did not want her working there, and she should not return to work. She never received a formal acknowledgment of her termination from HR or the chancellor's office.  She enlisted the help of CLEAT and was told that CLEAT could only take her so far. Finally, the CLEAT attorney (Bob Thomas) told her to turn in her gear, or they (Lt. Postell and Chief Cunningham) might file bogus charges against her like they did another officer, Joe Portillo. She was well aware of the Joe Portillo situation and how officers who were not even on the scene could file bogus statements against him. She was afraid, so she turned in her gear.

126.    Shonna Stoot - Race discrimination: Pay disparity/Denied promotion and advancement/False and unwarranted disciplinary actions. Ms. Stoot is an officer with the HCC police department. Her pay is less than White and Hispanic officers with comparable or less tenure.

Within the department, there are no verifiable guidelines on how to obtain a pay increase. Captain Martinez (Hispanic) and HR members set the salaries and continued to pay Black officers less than their White and Hispanic coworkers of similar tenure and experience. The pay disparity became more evident when HCC implemented its Displacement Plan and changed the pay scales. Black officers with many years of service and experience earned less than White and Hispanic officers. Black officers are disciplined more harshly for the same or similar policy violations as White and Hispanic officer. For example, Captain Martinez falsified TCOLE records so that other Hispanic officers could get promotions and pay increases. He was allowed to stay on at the department for months before the department suspended him. Previously, the department fired a former Black police officer for manipulating time and attempted to file criminal charges against him but took no such actions against Captain Martinez for his falsification of TCOLE records. Other HCC PD supervisors instruct supervisors to give purposefully poor evaluations for black officers so they can use that as justification to prevent pay increases.  In 2018, she applied for the position of quartermaster. Lt. Heliodor Martinez, a Hispanic male, interviewed her but told her that he would not give her that position during the interview. Instead, he offered her a job as a secretary at lower pay than she was currently earning.  She refused the offer. So, Lt. Martinez put her back on the street and did not allow Officer Stoot to attend roll call, claiming security officers were not allowed.  However, he allowed a Hispanic male security officer to attend roll call. Shortly after, the dispatcher told her that Lt. Martinez said he wanted a man for the position, and he (Lt. Martinez) hired a non-black male for the position.  On another occasion, an HCC teacher called and complained that Officer Stoot did not readily identify herself.  Lt. Martinez appeared onsite and yelled at her, coming within inches of her face. Officer Stoot was afraid that he was going to hit her.  Afterward, Lt. Martinez sent her to see Chief Cunningham, who also yelled at her, called

her a liar, and told her that she must take it whenever Lt. Martinez yelled at her.  He reassigned her to John Boxie and threatened to fire her if she continued being insubordinate.  She filed an internal OIE claim, and it was found in her favor.  Chief and Lt. Martinez had to take leadership classes as punishment, and they were instructed to remove the negative report from her file. Since this occurrence, Officer Stoot has found that she is now retaliated against and criticized for any minor infraction, whereas other White and Hispanic officers are given more leeway.  She has realized that because she spoke out against the department leadership, she is now being singled out and ripened for termination. Recently, Officer Stoot was placed on administrative leave and threatened with termination after her and another Black officer's body cam footage was selectively monitored in order to locate any departmental transgressions.  Such monitoring seems to target black officers at a higher rate as compared to the monitoring of White and Hispanic officers. Officer Stoot also reported that her, and other black officers body cameras seemed to frequently activate on their own volition without being manually turned on.  It is believed by Officer Stoot and other Black officers that this is yet another way that her supervisors can attempt to monitor Black officers in attempts to find purported violations and ripen them for termination.  Officer Stoot was also informed that her participation in this lawsuit could result in her termination, and she has since been placed on administrative leave.

127.    Leon Thibodeaux - Race discrimination: Denied employment opportunities. Officer Thibodeaux worked for Houston Community College as a full time Police Officer. He is currently a Police Officer at Houston Independent School District. Upon his resignation from HCC, he gave a two-week notice that he would be leaving the Police Department to start a new career in the Oil & Gas industry. He had a good record while working at Houston Community College and was eligible for rehire, leaving on good terms with the college. However, despite

multiple applications to be rehired at HCC since 2016, Officer Thibodeaux has been passed up for employment in favor of less qualified or unqualified white or Hispanic officers.  For example, former Chief of Police for HCC, Greg Cunningham, a white male, rehired Police Officer James Bailey, a white male, who was fired from Houston Community College for multiple sexual harassment claims under Title 9.  He also rehired Captain John Dziedzic, a white male, who was forced to resign for Illegal Hiring Practices on the Interview Board. However, despite the fact that Officer Thibodeaux is aptly qualified for the position, has held the position before, left the college in good standing, and has no previous instances of disciplinary action, he is constantly passed up for positions in favor of either less qualified white and/or Hispanic officers, or white officers like Bailey and Dziedic who have records marred by previous complaints, claims, and disciplinary actions.

128.    Godwin Unuigbokhai - Racial Discrimination: Denied Promotion/ Advancement/ Demotion/Income Loss/Retirement Loss—Mr. Unuigbokhai has been working at HCC for over 21 years. He held the position of Manager Technical Support position for more than eight years in HCC IT, including many years in other positions and holds a master's degree in Information Technology. He was told in a letter that the position he held would no longer exist as a result of "transformation." At the time this letter was presented to him in the presence of an HR representative (Satrice Morris), the new Campus Technology Services lead (Regional Manager) positions had already been filled while being advised to apply. Fortunately, he did apply for the Regional Manager Campus Technology Services position, which is equivalent to the Manager Technical Support position in functions that he held at the time the positions were still open.  He was told that he would not be considered for an interview nor offered a position. Instead, one of the three Regional Manager Campus Technology Services positions was offered to a Hispanic who

had no experience in the functions or duties of the position. The announcement of his new position identified his background in IT Project Management which is not directly related to the functions of the position he has been offered. In essence, he was demoted and now holds a Senior Technician position—a position that used to report to him.  He was not offered any explanation from his Hispanic manager as to why his senior role was taken away from him and awarded to a less qualified Hispanic individual.  He has experienced selective and bias treatment and racial discrimination from his Hispanic supervisors.  Saul Marroquin, a Hispanic manager in the IT department also made a statement in a meeting at the "Fraga Campus" in which Mr. Marroquin stated that the "Hispanics' were going to be running things, and this appears to be the case. Another Hispanic manager in the IT department, Mr. Quintero, stated that the older black employees, including Mr. Unuigbokhai, needed to be moved because they were too old to do their jobs. The manager Saul Marroquin was standing right there at the time and didn't object to anything he said.

129.    LaQuinta Vargas - Race Discrimination: Pay Disparity—Ms. Vargas is a current HCC employee and works as an Academic Advisor and Adjunct Professor. Ms. Vargas has been a loyal and dedicated employee. However, after the arrival of Chancellor Maldonado, her Hispanic supervisors have made it difficult for Ms. Vargas to fulfill her duties without feeling threatened, bullied, and worried about her job security.   Ms. Vargas and other black co-workers have faced constant scrutiny from their Hispanic supervisors, with reprimands for minor infractions whereas the white and Hispanic employees are not subject to such admonishments. Specifically, Ms. Vargas has been required to take on additional duties outside of her job description with little to no training.  Despite this, she is constantly reprimanded by her Hispanic supervisor even though her supervisor is the one that has failed to train her.  Other Hispanic and White employees are not

treated in such a manner, if at all.  Rather, when other white and Hispanic individuals in the department are given additional work, they are provided with stipends or other benefits for the additional work and at the very least provided with training so that they can adeptly perform their duties.  Ms. Vargas faces constant harassment and bullying by her immediate Supervisor, Dr. Noel Bezette.  On one occasion, after receiving approval from the Student Life Coordinator, Ms. Vargas attended a Student Life Event.  When Dr. Bezette saw Ms. Vargas there, she chastised her for attending the event without permission before finding out she did in fact have permission to attend the event.  Other white and Hispanic individuals under Dr. Bezette were not subjected to such accusations and treatment. Dr. Bezette has further made false claims and baseless accusations about Ms. Vargas' work performance in an effort to pad her file, subject to her unnecessary performance evaluations and reviews, and ripen her for termination. Dr. Bezette has further intimidated Ms. Vargas by alluding to her close relationship with Chancellor Maldonado and her connections with dignitaries within the city in an effort to keep Ms. Vargas from trying to move forward with any internal HCC grievance procedure. Interestingly, another employee told Ms. Vargas that she was subjected to the same type of treatment under Dr. Bezette.  The employee claimed that when she came from another department, Dr. Bezette told her that she needed to deal with "your type of people." Dr. Bezette even went so far as moving to have the employee terminated but the employee eventually filed a complaint with OIE, and the termination was overturned.  Ms. Vargas appears to just be the next victim in Dr. Bezette's path. Since Maldonado's onboarding, Ms. Vargas has realized that she is not paid as much as other white and Hispanic individuals in her department despite her comparable qualifications and experience.

130. Dorsetta Williams - Race discrimination: Pay Disparity/Denied Promotion/Workload Disparity/Advancement Denied. Ms. Williams has been employed at HCC

since 2014. Currently, she is the Manager of Curriculum Development and Instructional Design Services, a position she has held since 2015. Despite being qualified for more senior level positions, Ms. Williams has found advancing at HCC difficult to say the least after Maldonado's arrival. A former supervisor reported to Ms. Williams that he had recommended that she become the new Interim Executive Director of the department when he retired. But, Dr. Norma Perez, a Hispanic female and the Associate Vice Chancellor stated that either Ms. Williams would need to agree to do the job for a stipend or Dr. Perez would find someone else to do it. This is a common tactic at HCC, ask clearly qualified Black individuals to handle responsibilities for a stipend, rather than be properly promoted or paid a salary commensurate with that work. Ms. Williams also has noticed that other positions are not posted pursuant to college policy and the positions are merely given to certain white or Hispanic individuals without going through the proper interviewing and hiring process. Ms. Williams has witnessed a number Hispanic and/or white individuals placed into positions as interims that have been vacated by Black employees thus not allowing herself, or other black employees, to even apply for the position. After some time passes, the interims are given the actual position thus circumventing the hiring process and allowing white and Hispanic individuals to be selectively placed in coveted positions without competition.

131. Marcus Winters - Race discrimination: Pay Disparity/Denied Promotion/Workload Disparity/Advancement Denied. Mr. Winters has been a computer lab supervisor at HCC since 1998. After Maldonado's arrival, he was promised an opportunity to move up into a campus management position in return for picking up extra work in the department without a stipend by his manager Diana Castillo, a Hispanic female. He agreed and went along with his new duties and no stipend payment. Once the campus management position was created, Mr. Winters was passed on the position for a Hispanic female who was less qualified in terms of both education &

experience. The Hispanic female was in a secretary role at a different campus but was hired by Ms. Castillo. Even after being denied the position, Mr. Winters was forced to keep performing the additional duties without the stipend. Still with the college after almost 23 years of employment, he has still been relegated to the role of lab supervisor despite his qualifications to be promoted to a campus manager. Mr. Winters also faces issues regarding pay disparity. His former supervisor, Ernest Reynolds, a black male, fought to have his pay increased, but Mr. Reynolds was removed by the college from his role before the pay disparity had been addressed. He was previously given a raise only after a new labor law came into effect which required an uptick in his salary. Despite this raise, it is Mr. Winter's understanding that other white and Hispanic employees make roughly fifteen thousand dollars more a year than he does even though he has the same experience and qualifications.

### D. "Blocked or Asleep at The Controls"

132. All named Plaintiffs have suffered the sting of HCC's clearly retaliatory, discriminatory, and racially offensive conduct. HCC's policies expressly authorized appeals to its Board of Trustees—and there have been many by Black employees since Maldonado has been chancellor. However, HCC's Board of Trustees has chosen not to reasonably address or correct what has repeatedly happened to the Black Plaintiffs. And, with clear knowledge of these appeals, the Board has chosen not to correct obvious wrongs. As such, HCC's Board has knowingly ratified the offensive and discriminatory conduct occurring at the College, including the systemic pattern, practice, policies, and custom of the College's Displacement Plan for Blacks. Additionally, the Board has delegated to Maldonado and his henchmen the final decision-making authority relating to the firings, displacements, retaliations, and racial discrimination against Black employees alleged in this case.

## VI.
### CAUSES OF ACTION

133. Plaintiffs re-urge by reference all the allegations contained above and assert the following causes of actions against the Defendant named in this suit as specified below:

**VIOLATION OF 42 U.S.C. § 1981 AND 42 U.S.C. § 1983**

134. This claim is brought on behalf of all Plaintiffs in their individual capacity.

135. HCC intentionally and/or deliberately engaged in the aforementioned practices, policies, customs, and actions which are unlawful under 42 U.S.C. § 1981 and actionable under 42 U.S.C. § 1983.

136. Plaintiffs are (1) members of a recognized racial minority, (2) there was an intent to discriminate against them on the basis of their race by the College; and (3) the alleged discrimination concerns one or more of the activities enumerated in § 1981.

137. The College has engaged in a system and custom of policies, practices, and pattern of conduct under color of law that has damaged Plaintiffs with discriminatory and retaliatory intent.   As a part of this scheme, the College regularly creates pretextual and often objectively false justifications for its adverse actions against Plaintiffs.  This scheme both constitutes disparate treatment and creates a disparate impact on Plaintiffs.

138. Plaintiffs were retaliated against in violation of 42 U.S.C. Section 1981 as enforced under 42 U.S.C. § 1983. the College's retaliation against Plaintiffs was part of a broad custom, policy, pattern, and practice of retaliation against its Black employees.  Specifically, Plaintiffs engaged in protected activity by complaining about the exclusion of Blacks from their regular or authorized duties and in complaining about the systematic targeting and investigation of Black employees. The College acted adversely against Plaintiffs under color of law, and the adverse action was taken because of Plaintiffs' protected activity.  A reasonable employee would have

found the challenged action materially adverse, and the challenged action would have dissuaded a reasonable worker from engaging in the protected activity.

139.   As a result of their protected status and actions under 42 U.S.C. § 1981, Plaintiffs suffered adverse employment actions, including but not limited to being investigated, harassed, falsely accused, made to agree to false charges, being written up, and ultimately, constructively discharged from their employment or job functions.  In other instances, they were denied career advancement opportunities because of their race.  The working conditions were so intolerable and hostile that Plaintiffs could not reasonably be expected to endure the working environment and situation, thereby forcing them to resign or tolerate being discriminated against just to keep their employment.  Plaintiffs seek damages exceeding $50,000,000.00.

## VII.

### JURY DEMAND

140.   Plaintiffs demand a jury trial.

## VIII.
### ATTORNEYS' FEES

141.   HCC's actions and conduct as described herein, and the resulting damages and losses to Plaintiffs, have necessitated Plaintiffs retaining the services of lawyers and law firms listed below to investigate, initiate, and prosecute the claims in this lawsuit.  Plaintiffs seek recovery of reasonable and necessary attorneys' fees under 42 U.S.C. § 1988 and any other applicable law or statute, as well as expenses, court costs, and expert witness fees.

## IX.
### PRAYER AND DAMAGES

142.   As a direct and proximate result of the Defendant the College conduct, Plaintiffs seek judgment against the College for their damages suffered in the following particulars:

a.  Lost wages in the past and future;

b.  Lost health insurance and related benefits in the past and future;

c.  Loss of pension and/or retirement benefits;

d.  Emotional suffering in the past and future;

e.  Stigma damages;

f.  Mental anguish damages;

g.  Punitive damages;

h.  Attorneys' fees, costs, and expenses;

i.  All equitable, injunctive, and declaratory relief to the extent allowed in law or at equity to which Plaintiffs may show themselves justly entitled;

143.  Plaintiffs assert their individual compensatory damages are between $1,000,000.00 and $2,500,000.00 each; and punitive damages;

144.  Finally, Plaintiffs seek injunctive relief against the College to enjoin its discriminatory practices against Black employees.  The College must be permanently enjoined from discriminating against Black candidates and employees in hiring, disciplining, and termination decisions.

Respectfully submitted,

**The HALL LAW GROUP, PLLC**

*/s/ Benjamin L. Hall, III*
**Benjamin L. Hall, III**
State Bar No. 08743745
Federal Bar No. 8787
bhall@bhalllawfirm.com
**William L. Van Fleet II**
State Bar No. 20494750
Federal Bar No. 3670
bvfleet@comcast.net

**Ryan Finnegan**
State Bar No. 24119322
Federal Bar No. 3689829
RFINNEGAN@THLF.US
THE HALL LAW FIRM
530 Lovett Blvd.
Houston, Texas 77006
Telephone:  (713) 942-9600
Facsimile:  (713) 942-9566

-AND-

**The HITTNER GROUP, PLLC**

**George J. Hittner**
State Bar No. 24038959
S.D. TX No. 431901
george.hittner@thehittnergroup.com
P.O. Box 541189
Houston, Texas 77254
Phone: (713) 505-1003

-AND-

**The VILLACORTA LAW FIRM, P.C.**

**Adrian V. Villacorta**
State Bar No. 24003111
530 Lovett Blvd.
Houston, Texas 77057
Telephone: (832) 991-8864
Facsimile: (832) 201-7469
avillacorta@avvlaw.com

-AND-

**JIMMY   ARDOIN   &   ASSOCIATES, PLLC**

**James Ardoin**
State Bar No. 24045420
S.D. TX No. 571281
4900 Fournace Place, Suite 550
Houston, Texas 77401
Phone: (713) 574-8900
Toll Free: (888) 701-8509

Email: jimmy@jimmyardoinlaw.com

**-**AND-

**Ahmad, Zavitsanos, Anaipakos,
Alavi & Mensing, P.C.**

Joseph Y. Ahmad
Texas Bar No. 00941100
S.D. Tex. Bar No. 11604
Jordan Warshauer
Texas Bar No. 24086613
S.D. Tex. Bar No. 2994699
Edward B. Goolsby
Texas Bar No. 24092436
S.D. Tex. Bar No. 2505570
Nathan B. Campbell
Texas Bar No. 24097455
S.D. Tex. Bar No. 2745040
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Tel: (713) 655-1101
Fax: (713) 655-0062
joeahmad@azalaw.com
egoolsby@azalaw.com
jwarshauer@azalaw.com
ncampbell@azalaw.com

**ATTORNEYS FOR PLAINTIFFS**